**In re Paul W. GOODRICH, Debtor.**

**SHAWMUT BANK, N.A.,
Plaintiff, Appellant,**

**v.**

**Paul W. GOODRICH, Defendant,
Appellee.**

**No. 92–2262.**

United States Court of Appeals,
First Circuit.

Heard March 1, 1993.

Decided July 26, 1993.

---

Michael C. Gilleran with whom Paul M. Tyrrell and Shafner & Gilleran, Boston, MA, were on brief, for plaintiff, appellant.

Robert H. Quinn with whom Austin S. O'Toole and Quinn and Morris, Boston, MA were on brief, for defendant, appellee.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

BOUDIN, Circuit Judge.

Shawmut Bank, N.A. asked the bankruptcy court to rule that the $109,000 debt owed to it by Paul W. Goodrich is not dischargeable in his Chapter 7 bankruptcy because it was obtained through deliberately false statements on which the bank relied. The bankruptcy court held that only $10,000 of the debt was nondischargeable and the district court affirmed. We conclude that the entire debt is nondischargeable and remand.

On September 4, 1985, Goodrich signed a promissory note and credit agreement with Shawmut giving him an unsecured revolving $100,000 line of credit. This arrangement reflected his long-standing relationship with the bank and his partnership in a Boston law firm. Goodrich agreed to pay periodic finance charges and to repay the outstanding balance and any accrued interest on demand. He was not asked for a personal financial statement at the time but agreed to submit such statements on request. The line of credit was to expire, and any outstanding principal and interest were payable, on the anniversary date.

On February 22, 1986, Shawmut increased the line of credit to $150,000, and then on September 4, 1986, it renewed the line of credit. On June 24, 1987, Goodrich gave Shawmut a personal financial statement dated as of December 31, 1986, which represented that the bank could rely upon it as true unless given written notice of a change. The line of credit was renewed again on September 4, 1987, and again on September 7, 1988. Prior to the September 4, 1987, renewal, Goodrich had drawn down and owed $99,000 under the line of credit. On November 18, 1988, Goodrich drew down an additional $10,000, making his total debt to Shawmut $109,000, exclusive of interest.

Thereafter, Goodrich filed for bankruptcy under Chapter 7. Shawmut, on July 8, 1991, began an adversary proceeding in this bankruptcy objecting to any discharge of Goodrich's debt to the bank. It claimed that Goodrich in his financial statement submitted

in June 1987 had failed to list $9 million in contingent liabilities and made certain other material misstatements or omissions. Shawmut invokes 11 U.S.C. § 523(a)(2)(B), which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> . . . .
>
>> (B) use of a statement in writing—
>> (i) that is materially false;
>> (ii) respecting the debtor's or an insider's financial condition;
>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>> (iv) that the debtor caused to be made or published with intent to deceive[:]

The bankruptcy court, after an evidentiary hearing, found in an oral opinion that the financial statement did contain material falsehoods respecting Goodrich's financial condition made with intent to deceive; and as these findings are uncontested on this appeal, we need not elaborate. The bankruptcy judge also found that Shawmut had proved that it "would not have renewed the loan had Mr. Goodrich made full and complete disclosure of these contingent liabilities." But, the bankruptcy judge continued, this fact does not show that such a refusal to renew would have meant that Goodrich would then have repaid the loan (which then stood at $99,000). The oral opinion concluded:

> And so, to that extent, to the extent of the balance which was outstanding at the time that they [Shawmut] received and could have relied upon this financial statement there was no reliance. The money was already out the door and would not come home just because a false financial statement was given.

The bankruptcy judge then ruled that the bank had proved reliance upon the false financial statement to the extent that it had advanced $10,000 after the financial statement was provided to it and that this amount, together with pertinent costs, was the amount that would not be discharged by bankruptcy. On appeal, the district court affirmed in a memorandum, echoing the reasoning of the bankruptcy judge and relying specifically upon *Danns v. Household Finance Corp.*, 558 F.2d 114 (2d Cir.1977), which we discuss below.

Although we disagree with the outcome reached by the bankruptcy judge and the district court, it is only fair to say that this provision of the Bankruptcy Code, governing nondischargeability for false statements, has spawned a fair amount of case law, intercircuit conflicts and considerable confusion. The seeming simplicity of section 523(a)(2)(B) conceals not only a couple of linguistic traps but a lineage of opaque legislative history. Still, the simple language of section 523(a)(2)(B) is the starting point for analysis and, in the end, the basis for our decision.

Reading the statute literally, Shawmut appears to meet each of its requirements needed to make the $99,000 loan nondischargeable. The $99,000 loan was a "debt" reflecting a "renewal . . . of credit"; the renewal was "obtained by . . . use of a statement in writing"; and the writing was "materially false," it was related to Goodrich's financial condition, Shawmut "reasonably relied" on it, and it was made with intent to deceive. Although the statute bars discharge only "to the extent" that the renewal was obtained by the false statement, we think this causation element—also reflected in the statute's "reliance" requirement—is easily satisfied here as to the full $99,000.

The bank offered evidence from a bank official that the $99,000 loan would "probably" not have been renewed in either 1987 or 1988 if the true financial liabilities of Goodrich had been set forth in the financial statement he submitted; that the bank relied upon the financial statement in its renewal of the loan; and that the omission of material information was a "substantial factor" in causing the renewal. This evidence, presumably, led to the bankruptcy court's finding

that "the bank has demonstrated by a preponderance of the evidence that they [sic] would not have renewed the loan had Mr. Goodrich made full and complete disclosure...."

The evidence amply supports the finding. Likelihoods are about all that can be expected where the question is what the bank would have done five years ago if faced with a disclosure that did not occur. Indeed, there is case law that supports the view that it is enough if the misstatement or omission is a "substantial factor" in the decision to make or renew a loan. *In re Gerlach*, 897 F.2d 1048, 1052 (10th Cir.1990) (collecting cases). After all, if a financial statement is materially false and intended to deceive, then a showing that the creditor "relied" upon it arguably requires no more than that the creditor took it into account and gave it weight. Here, the bankruptcy court's explicit finding already quoted makes fine distinctions unnecessary.

Although each of the statutory requirements of section 523(a)(2)(B) is thus satisfied, Goodrich remarkably enough does have two decent arguments in his favor. The first is that some courts have read into the statute yet another requirement, not reflected in its explicit language, that the creditor show that it was *damaged* by the false statement. *See* Norton, *Bankruptcy Law and Practice*, § 27.41, at pt. 27, p. 76 & n. 22 (1991) (collecting cases); *cf. In re Siriani*, 967 F.2d 302 (9th Cir.1992) (limited damage requirement). Damage is easily shown where the bank lends money *after* receiving a false statement and in reliance upon it. But in the case of a renewal of an earlier untainted loan, it is possible that the bank would have called the loan if accurate information had been furnished on renewal and yet been unable to collect a penny before bankruptcy.

This possibility appears to be what the bankruptcy judge had in mind when he said of the $99,000 that "[t]he money was already out the door and would not come home just because a false financial statement was given." Although the bankruptcy judge used the phrase "no reliance" immediately before making this statement, a later passage suggests that he meant that the bank had not—

so far as the $99,000 was concerned—"relied to its detriment." In other words, the bank relied on the false statement in renewing the loan (the judge had already so found), but—in the judge's view—the bank had not shown that the reliance caused the ultimate loss.

The bank on appeal zealously contests this "finding" of no detriment. It asserts that Goodrich's financial statement on renewal showed that he had over $800,000 in cash, bank deposits and marketable securities. It follows, says Shawmut, that the bank could have collected the money by calling the loan or by insisting that securities or real property interests of Goodrich be pledged to secure the loan. In any event, Shawmut argues, there is no requirement that it show detriment in the sense of ultimate loss; reasonable reliance on the false statement in renewing the loan is enough.

█ We agree with Shawmut that the only detriment that need be shown is the renewal of the loan. To be sure, it would not be absurd to require, in addition, that the bank show that it could—or even would—have collected on the loan prior to bankruptcy but for the renewal. Some courts have done so. The nondischargeability provisions are frequently construed in favor of debtors. 3 *Collier on Bankruptcy* ¶ 523.05A (15th ed. 1993) (collecting cases). Further, one could argue that if the bank was not ultimately harmed by the renewal, it should not be able to improve its situation in the bankruptcy proceeding based on the happenstance that the renewal was based on a false statement.

The difficulty is that including this further requirement of actual damage is a policy choice. There is no indication in the statutory language that Congress made such a choice, and the evidence from legislative history is inconclusive. The statute is quite detailed in its conditions for nondischargeability. Had Congress wished to add "damage" as an element, it could easily have done so, especially since some of the decisions favoring this requirement were issued before the elaboration and reenactment of section 523(a)(2)(B) in 1978. Congress, as we shall see, actually had some knowledge of case law construing the predecessor section when it adopted its new version.

If it considered the matter at all, Congress could easily have concluded on policy grounds that a damage requirement was not appropriate. The debtor, by hypothesis, has caused the trouble by making a materially false statement with intent to deceive and the creditor has reasonably relied upon the statement in renewing the loan. Congress could have thought that making the bank shoulder the further burden of proving that it could have collected the loan prior to bankruptcy— a matter of solvency on which the debtor has most of the information—was not a proper addition to the compromises reflected in section 523(a)(2)(B).

The legislative history of section 523(a)(2)(B) is invoked at some length by both sides, and it does in fact discuss the case in which a loan is renewed. We find the discussion tangled, if not contradictory, but note that it lends some support to Shawmut by stressing that "[t]he amount of the debt made nondischargeable on account of a false financial statement is not limited to 'new value' extended when a loan is rolled over." H.Rep. No. 595, 95th Cong., 1st Sess. 129–30 (1977), 1978 U.S.Code Cong. & Admin.News, 5787, 6090, 6091. The problem is that the question here is when, and on what conditions, is the "old money" made nondischargeable, and on that issue the same legislative history may be more confusing than helpful. *Id.*[1]

In all events, even if Congress never considered the point one way or the other, the outcome is the same. Congress enacted a detailed statute without an explicit damage requirement. In the face of conflicting policies for and against, there is no warrant for the court to add such a requirement. Accordingly, there is no need here to weigh the bank's evidence or disturb the bankruptcy judge's conclusion that there was no detriment, in the sense he used the term, so far as the $99,000 is concerned. Instead we hold that detriment or damage in that sense is not required for nondischargeability. *Accord In re Gerlach*, 897 F.2d 1048 (10th Cir.1990).

To the extent that the Ninth Circuit is in disagreement, *see In re Siriani*, we prefer to follow *In re Gerlach* for the reasons already set forth.

Yet there is more to be said. The district court, in affirming the bankruptcy court, used some of the same reasoning but also invoked a different argument, renewed by Goodrich in this court, by relying upon *Danns v. Household Finance Corp.*, 558 F.2d 114 (2d Cir.1977). *Danns* is a curious case decided under the predecessor to section 523(a)(2)(B) which used largely similar language. There the debtor secured a new loan from a finance company based on false statements; and the question was whether this false statement also rendered nondischargeable an earlier untainted loan that the finance company consolidated with the new one simply because state law forbade the company from having two loans to the same debtor.

The Second Circuit ruled in a very brief opinion that "there was no evidence that the original loan was renewed in reliance on the false representations," but instead it was renewed and consolidated because of the state law. 558 F.2d at 116. Thus, said the court, the renewal was not "a true extension of the original loan; the record does not show that [the original loan] ... would have fallen due sooner had it not been for the refinancing." *Id.* The court concluded that "the only credit extended in reliance on Danns' misrepresentation was the additional amount loaned," and only this new cash was nondischargeable. *Id.*

We have devoted this space to describing *Danns* because Congress, in adopting section 523(a)(2)(B) in the following year, may be taken to have endorsed it by name. After the bill emerged from a House–Senate Conference Committee, Section 523(a)(2)(B) was explained to both the House and Senate in the following terms:

> In many cases, a creditor is required by state law to refinance existing credit on

---

1. Just as the House Report is on balance helpful to Shawmut, so there are floor statements (quoted below) that are marginally helpful to Goodrich. This floor language does use the phrase "relied to his detriment," as the bankruptcy judge did in this case; but the phrase was used only in the context of discussing the special problem of *In re Danns*, and we decline to read it as a general gloss on the statute, which contains no such words.

which there has been no default. If the creditor does not forfeit remedies or otherwise rely to his detriment on a false financial statement with respect to existing credit, then an extension renewal, or refinancing of such credit is nondischargeable only to the extent of the new money advanced; on the other hand, if an existing loan is in default or the creditor otherwise reasonably relies to his detriment on a false financial statement with regard to an existing loan, then the entire debt is nondischargeable under section 523(a)(2)(B). This codifies the reasoning expressed by the second circuit in *In re Danns*, 558 F.2d 114 (2d [C]ir.1977).

124 Cong.Rec. 24, 32399 (1978) (statement of Rep. Edwards), 124 Cong.Rec. 25, 33998 (1978) (statement of Sen. DeConcini). We do not find this general language very helpful in resolving the present case—there was no state law here requiring refinancing and, while the $99,000 loan was not "in default," Goodrich's debt to Shawmut was repayable on demand. Further, we regard the floor discussion more as an attempt to explain and approve *Danns* than as a general gloss on the statute.

Nevertheless, the floor statements are pretty good evidence that Congress approved of *Danns* and, on that assumption, it is appropriate to measure our case against the rationale of *Danns*. The Second Circuit's holding was framed as an interpretation of the "reliance" requirement that is explicit in the statute. The court said that the finance company did not "rely" on the false statement in continuing the original loan because the old loan was not up for renewal at the time of the new loan, and the old loan was consolidated and renewed solely because of New York's "one loan" law. *Danns* may have depended also on the court's sense of fairness. After all, whatever the causal relationship between the false statement and the renewal of the old loan, it was sheer accident—a twist of New York law—that the old untainted loan was renewed rather than left alone.

By contrast, Goodrich's loan expired in September 1987, and then again in September 1988, unless renewed. It was the bank that called for the financial statement prior to the September 1987 renewal, presumably because it had an interest in managing the line of credit and the $99,000 loan. So far as appears, the later draw down of $10,000 more, which occurred in late 1988, was not an issue when the bank accepted the false financial statement and considered it in renewing the loan in 1987. Here, the evidence showed that the bank did "rely" on the false statement in renewing a loan that would otherwise have fallen due. Accordingly, we think that *Danns* is distinguishable in both letter and spirit.

We therefore *vacate* the judgment of the district court and *remand* to the bankruptcy court with directions to include the $99,000 original loan in the amount of debt deemed nondischargeable, together with the later $10,000 loan whose status is undisputed. The question of what costs and fees are appropriately due to Shawmut is not before us, and we do not address it.

*It is so ordered.*