**In re Fred C. ATTALLA and Despina Attalla, Debtors.**

**Charles WINGATE, Jr., and John J. Dagianis, Individually and as Trustees of the Nashua Eye Associates Profit Sharing Trust and Nashua Eye Associates Money Purchase Pension Trust, Plaintiffs,**

v.

**Fred C. ATTALLA, Defendant.**

**Bankruptcy No. 92–11924.
Adv. No. 92–1148.**

United States Bankruptcy Court,
D. New Hampshire.

Dec. 16, 1994.

Stuart Holber, Phillips, Gerstein & Holber, Haverhill, MA, for plaintiffs Charles Wingate, Jr. and John J. Dagianis, Individually and as Trustees of the Nashua Eye Associates Profit Sharing Trust and Nashua Eye Associates Money Purchase Pension Trust.

Michael J. Scott, Michels & Michels, Londonderry, NH, for defendant Fred C. Attalla.

Jeffrey Schreiber, Chapter 7 Trustee, Danvers, MA.

Gerri Karonis, Manchester, NH, for U.S. Trustee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding was tried before the Court on July 26, 1993 on a complaint by the plaintiffs asserting that certain obligations stemming from their investment in the proposed real estate development project with the debtor are nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code as involving monies advanced and obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" as provided in that statutory provision.[1] This statutory provision follows a general introductory provision under § 523(a) providing that a discharge in bankruptcy does not discharge "any debt" for "money ... or an extension, renewal, or refinancing of credit" if either the subparagraph (2)(A) or (2)(B) provisos are applicable. This Court has earlier held that these provisos were intended by Congress to be mutually exclusive and has found that the language "statement respecting ... financial condition" has to be construed in that light. See *In re Sansoucy*, 136 B.R. 20, 23 (Bankr.N.H.1992).

The Court rendered final judgment on July 27, 1993 in which it was determined that a portion of the monies advanced by the plaintiffs, in the sum of $51,849.83, in August of 1989, were monies obtained by material and false misrepresentations of fact by the debtor which were reasonably relied upon by the plaintiffs and induced the advance of those monies to their detriment. Therefore the obligation of the debtor to the plaintiffs in that amount was determined to be nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code. The Final Judgment determined that all other monies advanced by the plaintiffs with regard to the real estate project in question were determined to be dischargeable under the Bankruptcy Code.

A Motion for Reconsideration of this final judgment was filed on August 4, 1993. The Court held a hearing on August 16, 1993 in

---

1. The complaint as originally filed alleged nondischargeability under § 523(a)(2)(B) of the Code, as involving a false financial statement. However, the financial statement involved was an unsigned document dated June 1, 1989 and was not presented to the debtor until August 8, 1989, at which time it was obviously stale, and required further oral statements and assurances by the debtor at a meeting with the plaintiffs concerning the advance of additional funds by the plaintiffs. The plaintiffs also relied on additional oral misrepresentations made by the debtor at the August 9, 1989 meeting. The pretrial order entered January 22, 1993 (Court Doc. 7) provides that the issue to be resolved is under § 523(a)(2)(A) and the parties stipulated at the July 26, 1993 hearing and have throughout tried the matter, both in the original and the supplementary hearing, on the basis of § 523(a)(2)(A) of the Code.

which it was determined that a limited reopening of the adversary proceeding was warranted in view of the intervening decision by the Court of Appeals for the First Circuit in *Shawmut Bank, N.A. v. Goodrich*, 999 F.2d 22 (1st Cir.1993). In a Procedural Order entered August 23, 1993 (Court Doc. 18) the Court reopened the adversary proceeding for a further one-day evidentiary hearing to accept further evidence as might be relevant in connection with the legal rulings made by the Court of Appeals in the *Goodrich* decision. The continued evidentiary hearing was held on April 4, 1994 after which the questions raised by the Motion for Reconsideration were taken under advisement.

## ORIGINAL FINDINGS AND CONCLUSIONS

The Court's original Final Judgment of July 27, 1993 was based upon findings of fact and conclusions of law dictated into the record at the conclusion of that trial. No formal transcript was ordered by the parties with regard to that trial but the Court has had prepared a transcription from the hearing tapes by Court personnel which will suffice for present purposes. The findings and conclusions reached by the Court after the 1993 hearing, which are hereby incorporated by reference with certain relatively minor corrections for specificity or continuity, are as follows:

### Transcription of Comments Dictated at Conclusion of Trial on July 26, 1993

The complaint and trial in this matter revolves around a series of advances made by the plaintiffs with regard to a real estate development project in Maine in which the plaintiffs loaned money and took equity kickers of various percentages in the transactions involved.

There has been a considerable amount of testimony about the initial stage of the relationship between the parties, which I have referred to as Act I of this drama, and in which I believe the evidence fails to support any legally cognizable ground for nondischargeability as to the initial advances with regard to this project.

The evidence is uncontroverted that the plaintiffs advanced some $200,000 during the period of December 1988 through April of 1990, and also obligated themselves as co-makers on a $500,000 note to the Nashua Trust Company for the financing of either the acquisition or the development of the project, without obtaining any financial statements directly from the debtor or any other detailed data that has been put into evidence before the Court upon which they may have relied.

It is my judgment that these plaintiffs relied on two basic factors in going into this deal. Number one, they had a very pleasant and profitable experience with the debtor in a prior project, in Massachusetts, a couple of years earlier, in which they recovered four-fold on their investment in a short period of time. The doctors were using their own funds and pension fund monies from their own eye clinic account and relied in my judgment basically on a one Mr. O'Leary who arranged that profitable enterprise in going into that project. Mr. O'Leary received $20,000 out of the prior project and was apparently cut into each of these deals for a percentage of the profit, which in my mind made him a major party upon which the doctors would have relied as to whether they should go into a project.

The other major reliance they had, however, was that one of the doctors happened to be on the board of directors of the Nashua Trust Company and therefore had access, at least at that time, to the loan application and the supporting personal financial statement of Mr. Attalla submitted to the Bank. Parenthetically, I should note that while the doctors apparently were and perhaps still are under the impression that they were only co-signors on the Nashua Trust loan the fact is that all the loan documents and all the notes they signed made them co-makers of the obligations relating to the project being financed by the Nashua Trust Company.

Doctor Wingate, who was the director on the board of directors, had access to the documentation and apparently even at that time was allowed to sit in on the board of

directors' meeting that approved the loan although he couldn't participate or vote on the loan approval.

Suffice it to say that Doctor Wingate learned what he wanted to know about the financial condition of Mr. Attalla from that source and relayed this information to Dr. Dagianis, the other plaintiff here. From this record it is my judgment that whatever reliance there was by these doctors in advancing the initial $200,000 and going onto the Nashua Trust Company loan as co-makers was reliance basically on the happy experience with the prior investment and the financial information that they obtained on Mr. Attalla through the Bank's loan file.

There is nothing in this record to indicate that any of that representation by Mr. Attalla to the Bank, which plaintiffs had access to, was false in any respect.

Accordingly with regard to the $200,000 advanced during the December 1988 through April of 1989 period there is simply a failure of proof to show that it was induced by any material false representation by the debtor and that will be the judgment of the Court.

With regard to the additional $51,849.83 advance that the plaintiffs made in August of 1989, the scene shifts to Act II, in which all was not sweetness and light anymore, because it was becoming apparent that Mr. Attalla was having some problems with cash flow as he described it. More specifically the doctors were told, either through Mr. O'Leary or directly, that Mr. Attalla was not able to make the mortgage payments on the project, including Nashua Trust, and that he was also behind on some engineers' billings. Furthermore, as early as March of 1989 he had to request that the $50,000 reserve for engineering expenses under the Nashua Trust loan be opened up to be used for paying current interest to keep that loan current.

All of these factors culminated and caused a meeting between the parties on August 8, 1989 to see just what the status of this thing was. It is important to note that at this meeting the doctors themselves were full participants. This record indicates that prior to that time Mr. O'Leary would do all the dealings with Mr. Attalla, primarily, and the doctors would "pop in" at the end of such meetings. It is my view and finding that the doctors throughout were relying on Mr. O'Leary's analysis and recounting of information received by Mr. Attalla with regard to this project and/or the prior projects.

However, the meeting of August 8, 1989 was a meeting in which the doctors became personally involved and queried Mr. Attalla with regard to his financial situation. At that meeting Mr. Attalla presented an unsigned financial statement which is Exhibit 25 in this record, for the plaintiff, which is dated June 1, 1989, That financial statement clearly has a number of false representations of a material nature, i.e., that he had cash on hand of $85,000; that he had salary, bonuses and commissions in 1988 of $300,000; and that a number of properties supporting substantial asset values on the listing does not always accurately indicate who owned what, what the relationship was between Mr. Attalla and his brother as far as legal rights to the properties were concerned. The statement also does not clearly indicate that there were some liens listed once that were covered by cross-collateralization of other properties.

The cross-collateralization matter does not appear to me to be material from what I've heard in this record in that there is no indication that the doctors at the meeting paid any particular attention to the properties listed. The debtor's argument that he gave an overall asset-liability equation does indicate that there would have been double counting if he had done otherwise. If there had been discussion and focus on particular parcels that might have been given up as additional collateral, then it would have been material to disclose their actual lien structure and any blanket liens that might affect them. Suffice it to say that there is nothing in this record to indicate that there was that kind of focus on particular properties and I don't think that the list of properties by itself with the lien references constitutes any false or material representation in that regard.

The statement does however give a rather rosy picture of his financial condition in terms of income potential and cash position. It is true that it is dated in June 1989 but the evidence before me indicates that even in June he had close to zero cash position if not a negative one. It is clear from his income tax return that is in evidence that he had nothing close to $300,000 in salary, bonuses or commissions in 1988.

This brings the Court to the crucial factual issue in this trial, apart from the crucial legal issue as to the measure of damages if any, and that is what happened in August of 1989 meeting and who said what to whom and who did or didn't rely on what was said. The record on this point is in complete conflict. The doctors testify that they wanted to know what the status of the project was and that they were told in effect it was just a cash squeeze problem, that Mr. Attalla had plenty of equities and real property, that he was in effect land rich and cash poor, and that he could work out of this problem but he needed some immediate monies which he could not cover by himself to take care of some mortgage payments which otherwise might lead to foreclosure action by the Banks since he was behind a payment or two. Doctor Dagianis testified specifically that they asked why Mr. Attalla needed that amount of cash if he had $85,000 in cash as per the statement and was told by Mr. Attalla that he needed money to live on of course and he just couldn't use all that money. Dr. Wingate testified that Mr. Attalla indicated he needed more money for the reasons summarized above, that it was just a cash flow problem, that he didn't want to sell other properties, that he could/would pay it off but they were valuable and had potentials, etc., etc. and it was just a "cash squeeze" problem that would eventually be worked out.

The doctors initially said—and this is uncontroverted—that they didn't see why they should put up any more money and wouldn't put up any more money unless he matched it, which led to the question about the $85,000 cash position. The fact of the matter is that the doctors did advance the $51,849.83 as a result of the August meeting, with no immediate matching by Mr. Attalla, but on his promise and statement that he would match it when he worked his problems out, which he was assuring them was just a cash squeeze problem.

Mr. Attalla testified that he told them at the August meeting that he didn't have $85,000 in cash, that that cash was gone, that he had no money to cover the immediate need to pay the past-due mortgage payments, that he was having trouble paying the engineers as well, that as he had told O'Leary in July he would try to protect the doctors by giving them additional collateral, and that the financial statement he gave them at the meeting was outdated but was given by him only to show a list of the properties that might provide additional collateral. None of the testimony indicates from either side that there was in fact any detailed discussion about the additional collateral items at the meeting.

On the basis of this record, and making inferences from the context and the credibility of the witnesses as I've heard them, I believe the doctors' testimony of what happened in August is more near the truth of the situation than Mr. Attalla's testimony. I think that we are all human and we remember things the way we want to remember them but the doctors' account fits more realistically in the context than Mr. Attalla's in my judgment.

The doctors at that point had no notice of how severe the financial problems were. They were told that there was only a cash squeeze. I believe that that did happen. I also believe that Mr. Attalla in effect told them: "It's no big problem—I've got plenty of equities around—I am a substantial person with substantial income, substantial cash, and I can take care of my own activities, I can work this thing out but I have this short term problem." I believe the doctors did rely on the statement about income and cash and generally his representation that the cash squeeze was not fatal nor the end of their financial world. He represented that he had sufficient financial power to solve the project problem if he could get over this immediate hump.

I think on balance that representation was false and misleading in context. I think it did induce the doctors to part with their additional $51,849.83 whereas they might have otherwise cut their losses at that point.

Therefore, I will find that the debtor's conduct and oral statements, together with the unsigned financial statement that he presented to them at the August meeting, induced the doctors to part with additional monies to the tune of $51,849.83 and that they reasonably relied in that context upon his assertions which were materially false in various respects as indicated.

That brings me then to the legal question of what effect of this is in terms of nondischargeability of debt. The statute in question is 523(a)(2)(A) and it provides that a debt will be nondischargeable if it's for money, property, services or an extension, renewal, or refinancing of credit to the extent obtained by a false pretense or false representation or actual fraud. My view is that this does not bring up the whole debt in question, unless there is evidence that the creditors in such a situation were in effect deflected from a realistic opportunity to recover their entire investment at that time but instead exercised forbearance to their detriment to the extent of their entire exposure. I realize there is a split of authority in that aspect but my view is that the statute deals with inducement to obtain money or property of value and therefore the obtaining of forbearance, when there is no showing that had they not forborne they would have recovered their entire investment, is not sufficient to bring up in effect the entire loan transaction as though it was induced by some falsity. The falsity here occurred in August of 1989 and in no way was related to Act I of this drama, as I mentioned earlier, in which they parted with their $200,000 and got into the Nashua Trust transaction entirely apart from any false representations by the debtor. As I say there is nothing in this record as I see that would support a finding that if they

hadn't forborne in August they would have in fact recovered their entire investment including the exposure to Nashua Trust.

For all these reasons the Court will enter judgment against the debtor but only with regard to the $51,849.83 as being nondischargeable. The other debts between these parties will be determined to be discharged.

The plaintiffs contend that by virtue of the *Goodrich* decision this Court is bound to determine that not only the $51,849.83 advanced in August of 1989 be determined to be nondischargeable, but that in addition prior advances and guarantees by the plaintiffs in 1988 and early in 1989 at the outset of the project also must be determined to be nondischargeable even though the Court has specifically found that there was no actual fraud or false misrepresentation by the debtor with regard to those earlier advances and guarantees. The plaintiffs therefore contend that their entire outlay of $751,849.00 in connection with this debtor and the project be determined nondischargeable.[2]

## THE "GOODRICH" DECISION

In the *Goodrich* case, supra, the Court of Appeals for this Circuit was presented with an issue under § 523(a)(2)(B) of the Bankruptcy Code as to the extent of nondischargeability of a matured bank loan which was renewed upon the presentation to the bank's lending officer of a formal written financial statement by the borrower which contained false representations. Both the bankruptcy court and the district court below had ruled that only an additional $10,000 that was drawn down under the line of credit from the bank, after the renewal of the line of credit, was nondischargeable due to the fraud. The Court of Appeals reversed and directed that judgment be entered rendering the pre-existing $99,000 loan level under the revolving line of credit also be included in the amount of debt determined to be nondischargeable.

---

**2.** The plaintiffs were able to take over some of the properties with equities but also had to pay off the Nashua Trust loan and/or deficiency. The

$751,849.00 figure apparently is the net loss suffered by the plaintiffs regarding the Maine project. The defendant did not contest this fact.

The Bankruptcy Judge had found that the bank would not have renewed the loan had Mr. Goodrich made full and complete disclosure of his contingent liabilities. No party challenged this finding but the Bankruptcy Judge continued and found that such a refusal to renew would not have meant that Mr. Goodrich would then have repaid the entire loan and noted: "The money was already out the door and would not come home just because a false financial statement was given." 999 F.2d at 24.

The Court of Appeals notes that the statutory construction question is not simple and had provoked a conflict in the case decisions:

Although we disagree with the outcome reached by the bankruptcy judge and the district court, it is only fair to say that this provision of the Bankruptcy Code, governing nondischargeability for false statements, has spawned a fair amount of case law, inter-circuit conflicts and considerable confusion. The seeming simplicity of section 523(a)(2)(B) conceals not only a couple of linguistic traps but a lineage of opaque legislative history. Still, the simple language of section 523(a)(2)(B) is the starting point for analysis and, in the end, the basis for our decision.

Reading the statute literally, Shawmut appears to meet each of its requirements needed to make the $99,000 loan nondischargeable. The $99,000 loan was a "debt" reflecting a "renewal ... of credit"; the renewal was "obtained by ... use of a statement in writing"; and the writing was "materially false," it was related to Goodrich's financial condition, Shawmut "reasonably relied" on it, and it was made with intent to deceive. Although the statute bars discharge only "to the extent" that the renewal was obtained by the false statement, we think this causation element—also reflected in the statute's "reliance" requirement—is easily satisfied here as to the full $99,000.

The opinion in *Goodrich* goes on to note the counter-arguments available to a debtor-borrower in this context:

Although each of the statutory requirements of section 523(a)(2)(B) is thus satisfied, Goodrich remarkably enough does

have two decent arguments in his favor. The first is that some courts have read into the statute yet another requirement, not reflected in its explicit language, that the creditor show that it was *damaged* by the false statement. *See* Norton, *Bankruptcy Law and Practice*, § 27.41, at pt. 27, p. 76 & n. 22 (1991) (collecting cases); cf. *In re Siriani*, 967 F.2d 302 (9th Cir.1992) (limited damage requirement). Damage is easily shown where the bank lends money *after* receiving a false statement and in reliance upon it. But in the case of a renewal of an earlier untainted loan, it is possible that the bank would have called the loan if accurate information had been furnished on renewal and yet been unable to collect a penny before bankruptcy.

This possibility appears to be what the bankruptcy judge had in mind when he said of the $99,000 that "[t]he money was already out the door and would not come home just because a false financial statement was given." Although the bankruptcy judge used the phrase "no reliance" immediately before making this statement, a later passage suggests that he meant that the bank had not—so far as the $99,-000 was concerned—"relied to its detriment." In other words, the bank relied on the false statement in renewing the loan (the judge had already so found), but—in the judge's view—the bank had not shown that the reliance caused the ultimate loss.

The Court of Appeals in *Goodrich* nevertheless concludes that § 523(a)(2)(B) contains no requirement that the bank showed detriment in the sense of ultimate loss:

We agree with Shawmut that the only detriment that need be shown is the renewal of the loan. To be sure, it would not be absurd to require, in addition, that the bank show that it could—or even would—have collected on the loan prior to bankruptcy but for the renewal. Some courts have done so. The non-dischargeability provisions are frequently construed in favor of debtors. 3 *Collier on Bankruptcy* ¶ 523.05A (15th ed. 1993) (collecting cases). Further, one could argue that if the bank was not ultimately harmed by the renewal, it should not be able to improve its situa-

tion in the bankruptcy proceeding based on the happenstance that the renewal was based on a false statement.

The difficulty is that including this further requirement of actual damage is a policy choice. There is no indication in the statutory language that Congress made such a choice, and the evidence from legislative history is inconclusive. The statute is quite detailed in its conditions for nondischargeability. Had Congress wished to add "damage" as an element, it could easily have done so, especially since some of the decisions favoring this requirement were issued before the elaboration and reenactment of section 523(a)(2)(B) in 1978.

\* \* \* \* \* \*

If it considered the matter at all, Congress could easily have concluded on policy grounds that a damage requirement was not appropriate. The debtor, by hypothesis, has caused the trouble by making a materially false statement with intent to deceive and the creditor has reasonably relied upon the statement in renewing the loan. Congress could have thought that making the bank shoulder the further burden of proving that it could have collected the loan prior to bankruptcy—a matter of solvency on which the debtor has most of the information—was not a proper addition to the compromises reflected in section 523(a)(2)(B).

\* \* \* \* \* \*

In all events, even if Congress never considered the point one way or the other, the outcome is the same. Congress enacted a detailed statute without an explicit damage requirement. In the face of conflicting policies for and against, there is no warrant for the court to add such a requirement. Accordingly, there is no need here to weigh the bank's evidence or disturb the bankruptcy judge's conclusion that there was no detriment, in the sense he used the term, so far as the $99,000 is concerned. Instead we hold that detriment or damage in that sense is not required for nondischargeability. *Accord In re Gerlach*, 897 F.2d 1048 (10th Cir.1990). To the extent that the Ninth Circuit is in disagreement, see *In re Siriani*, [967 F.2d 302 (9th Cir.1992) ] we prefer to follow *In re Gerlach* for the reasons already set forth.

## ADDITIONAL FINDINGS AND CONCLUSIONS

As noted above, the *Goodrich* decision required the further hearing of April 4, 1994 in the present case, in which additional evidence was received relevant to the issues raised by that decision. Those issues briefly are as follows: (1) Does the analysis and basis for the decision in *Goodrich*, reached in a case involving § 523(a)(2)(B) of the Code, apply equally to a case under § 523(a)(2)(A) of the Code; (2) If *Goodrich* does apply to the present case is there a factual showing in the present case of the required "detriment" in terms of a "renewal of the loan"; (3) If *Goodrich* itself does not require the same legal ruling with regard to § 523(a)(2)(A) does subsection (2)(A) require as a matter of law a showing of reliance and detriment in terms of ultimate loss; and (4) If so is there a factual showing in the present case of "renewal" or "extension" of credit, and detriment in the "ultimate loss" sense, sufficient to render the entire obligation owing by the debtor nondischargeable?

Before addressing these questions the Court will set forth certain additional findings and conclusions from the evidence received at the April 4, 1994 hearing. While some of these findings may overlap the earlier findings they are more focused in terms of the issues now raised in light of the *Goodrich* decision.

The plaintiffs and the defendant entered into a transaction involving the development of an apartment and cluster home project in Sanford, Maine in December of 1988. The project land was made up of a number of separate parcels. The debtor had already invested $300,000 of his own monies into the project and had obtained additional monies by secured bank financing loans as to the various parcels. The project required an additional 88 acres which had not yet been acquired. That parcel was obtained by financing from the Nashua Trust Company, as part of the transaction with the plaintiffs,

with the defendant *and* the plaintiffs all signing as *co-makers* on the promissory note and mortgage to that Bank.

The plaintiffs advanced $50,000 upon the signing of an "Agreement Regarding Investment in Land" executed on December 7, 1988[3] (Exhibits 107 and 108).

Since the December 7, 1988 agreement is crucial to understanding what can only be described as a "hybrid" transaction, the pertinent provisions are set forth herein at length:

The objective of the investment is to share in the profit when the property is sold to a builder after:

— engineering has been performed and a plan has been designed to locate approximately 200 clustered house lots on site, and

— local approvals have been obtained for the plan.

Upon sale of the land, the investors are entitled to receive their $40,000 investment back, with a return equal to 15% of the profit made on the property.

If the land has not been sold by December 31, 1990, the investors have the option of:

— receiving their $40,000 investment back with a minimum return of 24% per year (or the maximum allowed by law) if approvals have not been obtained for the site, or

— receiving their $40,000 investment back with a return equal to 15% of the appreciation in the property if approvals have been obtained. In this case, the value of the property shall be determined by independent appraisal, and the return shall not be less than the return determined above where approvals have not been obtained.

If it becomes necessary to change the overall objective for the property (ie—to build the units), the investors have the option of remaining as investors under terms to be determined, or of receiving their investment back with a return calculated under one of the methods above, based on whether approvals have been obtained for the property.

(Exhibit 107) The additional agreement with regard to other parcels comprising the project was identical except that it referred to "400 apartment units" rather than "200 clustered house lots" and referred to "$160,000" rather than the "$40,000" amount in the first agreement. (Exhibit 108).

The agreement between the parties contemplated an indemnification agreement by the defendant to the plaintiffs which was also executed on December 7, 1988 (Exhibit 117).

The parties also agreed in a separate document executed on December 7, 1988 entitled "Understanding Regarding Payment and Return of Investment" that the funds to be provided by the plaintiffs would be paid over according to a specific time schedule tied to the closing of the requested loan from the Nashua Trust Company as follows:

The funds being invested in the projects on Route 202 & 11–A in Sanford, Maine shall be disbursed to Fred Attalla as follows:

$50,000 from retirement plan upon signing agreements

$30,000 from retirement plan when loan closing is scheduled

$20,000 from individuals when loan closing is scheduled

$60,000 from retirement plan 60 days after closing on loan

$20,000 from individuals 60 days after closing on loan

$20,000 from retirement plan 120 days after closing on loan

It is agreed that the $200,000 invested shall be returned ($160,000 to the retirement plan and $40,000 to the individuals) after the first sale (of either route 11–A or 202) that takes place.

(Exhibit 109)

The Nashua Trust loan was approved and was scheduled for closing shortly afterwards

---

**3.** Due to the separate parcels involved there were actually two agreements but the pertinent language was identical in each except as noted below.

and the plaintiffs from December 9 through December 14, 1988 advanced an additional $50,000 as agreed (Exhibit 27).

The Nashua Trust loan was closed in late December 1988 and triggered the requirement that the plaintiffs advance an additional $80,000 within 60 days of closing and the final $20,000 of their $200,000 investment 120 days after closing. The plaintiffs actually advanced an additional $60,000 on February 14, 1989 and an additional $20,000 on February 28, 1989 (Exhibit 27) and ultimately completed the remainder of their $200,000 investment in due course.

While the Nashua Trust loan had been approved for $500,000 the parties agreed that they would only initially draw $450,000 and that any request to withdraw the additional $50,000 would have to be approved by each of the borrowers. This was communicated to the Bank on December 21, 1988 (Exhibit 29).

On February 22, 1989 the plaintiffs through their attorney presented notes and mortgage documents to the defendant, which he signed, which provided for liens on the property in favor of the plaintiffs (Exhibits 30, 112, 113, and 127). The defendant had agreed verbally in December, at the outset of the transaction, that appropriate "documentation" would be executed to give the plaintiffs a lien on the project properties to protect their investment. The original executed writings between the parties did not require that he do so. However, he testified that he felt "morally bound" to execute the documents and did so.

The promissory notes executed on February 22, 1989 by the defendant in favor of the plaintiffs promises repayment of the $200,000 advanced by the plaintiffs but with regard to any due date states only that the $200,000 would be "payable" as follows:

Per Agreement Regarding Investment In Land On Route 11–A, Sanford, Maine and Indemnification Agreement dated November 30, 1988, attached hereto, incorporated herein and made a part hereof. Security for this note and indemnification Agreement shall be a second mortgage on property listed as Exhibit A attached hereto. (Exhibits 112 and 113)

The promissory notes executed on February 22, 1989 included further "boiler plate" paragraphs which obviously do not apply, or at least conflict with the terms of the December 1988 agreement, including acceleration of the note upon various defaults including a specified default arising from ".... failure to pay or default of prior encumbrances on the property securing this loan, or if the holder for any reason deems himself insecure....".

In view of the obvious conflict and arguable confusion between the terms of the original agreement and the terms of the promissory notes the court inquired of Mr. O'Leary during his testimony at the April 4, 1994 hearing as follows:

\*       \*       \*       \*       \*       \*

Judge Yacos: I have just a couple of questions and they relate to the same loan and investment but I'd like to relate it to this case and not to some abstract concepts. Because what I see as a deal struck in December 1988 whereby Mr. Attalla had a piece of property—the doctors could acquire an investment as you say—that might generate considerable profits like the last one. So he had the property to bring to the deal. He didn't have the money, he needed some investors. Right?

Witness: He had some of the property and then he needed some money....

Judge Yacos: He owned some of the property and he needed money to acquire the rest?

Witness: Correct.

Judge Yacos: How much. Do you know how much he had in at that point?

Witness: I don't off the top of my head.

Judge Yacos: But he had acquired some of the property and to complete the package he needed financing and to develop it he needed financing. Is that a fair statement?

Witness: Yes.

Judge Yacos: So a deal was struck in December of 1988 whereby the parties

agreed that he would put this property in that he had found and identified as a good prospect like his last one which your people are very pleased with and he was going to take $200,000 advanced by them the individual doctors and their pension fund ...

Witness: Yes.

Judge Yacos: And it was going to require $450,000 financing to acquire I guess the rest of the property. There was testimony earlier today that there was money necessary to acquire some portion I guess of the rest of the property. It was written for $500,000 has been some discussion about what the extra $50,000 was but that's not my question at this point. My point is that was the deal that was struck in December of 1988?

Witness: That's correct.

Judge Yacos: Under that deal he had two years to do it?

Witness: Yes.

Judge Yacos: Now in February of 1989 the notes and mortgages were signed, which your people testified that it was understood that for their advances they would get protection. They'd get a security interest.

Witness: That's right.

Judge `Yacos: Which they did. But the security documents—mortgage—among other things says if they feel insecure they can terminate the project at any time?

Witness: O.K.

Judge Yacos: Right?

Witness: Yes.

Judge Yacos: That sounds like a different deal than what was negotiated between these people in December. How is it a deal that you're bringing property into a thing and you have two years to develop it and when you do the documentation if that's all it was to be, you end up with a lot of additional default contingencies one of which is you are just insecure. Was there any discussion in February of 1989 as to these additional requirements?

Witness: No.

Judge Yacos: The notes were prepared?

Witness: That's correct.

Judge Yacos: By plaintiff's counsel?

Witness: That's right by one of Mr. Holber's associates.

Judge Yacos: Mr. Attalla signed it?

Witness: Yes.

Judge Yacos: So there was no meeting or anything to discuss how that might affect the December 1990 outside date?

Witness: No.

Judge Yacos: Were you party to any discussions at any time from December of 1988 through February of 1989 as to what if any the outside, as to whether there was any change in the outside date.

Witness: No.

\* \* \* \* \* \*

The plaintiffs contend that the February 1989 notes executed by the defendant removed the December 1990 outside date within which the defendant could develop the property without being obligated to repay their investments and gave them the right to call the loans earlier upon various defaults provided by the notes. While the Court has some question as to whether there was any consideration that would render this change in the terms of the deal between the parties enforceable, that issue was not raised by any party and as it happens is unnecessary to decide by virtue of further findings and rulings by the Court in this matter.

The record establishes that the defendant went into default on monthly payments on other prior mortgages upon the project properties, other than the Nashua Trust Company mortgage, in the period of April through June of 1989 and was advised of the same with demands for interest payments to be made current by the respective banks in letters received in July of 1989 (Exhibits 125 and 126).

These developments, together with my original findings regarding the situation in the summer of 1989, resulted in the meeting between the parties on August 8, 1989 summarized in some detail above.

As a result of that meeting the parties entered into an "Agreement Regarding Additional Investment In Land on Route 11–A Sanford, Maine" (Exhibit 122) executed on August 8, 1989, which provided *in toto* the following:

The investors have agreed to advance additional funds to Fred Attalla for a higher percentage of the profit made on the Rt. 11–A Sanford, Maine property. This agreement summarizes the terms and conditions of the additional advances.

1. The investors agree to advance $50,000 now, and commit another $80,000, if necessary, to cover future expenses. Advances beyond the initial $50,000 will be made only if Fred Attalla makes matching advances to the project.

2. Fred Attalla agrees to increase the investors return, so they receive their total investment back with a return equal to 45% of the profit made on the property. Fred Attalla further agrees to execute documents deemed necessary by the investors to properly evidence these advances, and that the investors have full access to his books and records relating to the Sanford property.

All other terms of the original agreement dated December 6 & 7, 1988 shall remain in effect.

It should be noted that no mention is made in this document as to the modification of the referenced 1988 agreement by the February 1989 notes and mortgages.

Under the August 8, 1989 agreement the plaintiffs by checks issued on August 9, 1989 advanced the sum of $51,849.83 discussed above (Exhibit 28).

On September 18, 1989 the defendant executed a promissory note and a mortgage drafted by the plaintiffs' attorney. The promissory note provided in its first paragraph the following:

FOR VALUE RECEIVED, the undersigned, which term wherever used herein shall mean all and each of the signers of this Note, jointly and severally, promise to pay to the order of Charles E. Wingate, Jr. and John J. Dagianis, Individually, the sum of One Hundred Thirty Thousand ($130,000.00) Dollars PAYABLE per agreement regarding investment in land on Route 11–A, Sanford, Maine dated December 6, 1988 and agreement regarding additional investment in land on Route 11–A Sanford, Maine dated August 8, 1989 attached hereto, incorporated herein, and made a part hereof.[4]

(Exhibit 115) While the note was made in the amount of $130,000 the plaintiffs did not in fact advance the additional amount to reach that figure inasmuch as the defendant failed to match their initial advance of the $51,849 amount.

As of August 9, 1989, the Nashua Trust Company loan and mortgage with regard to the 88 acre parcel of the project property was current and not in default. The original understanding between the parties was to the effect that the defendant would make the monthly interest payments of approximately $500,000 to Nashua to keep the loan current. The defendant in fact did so until March of 1989. As indicated above the parties agreed then to open up the reserve so that the additional $50,000 could be drawn down, at the rate of $5,000 per month, to pay the accruing interest and keep that loan from default.[5] This in fact was the situation in August of 1989 and apparently continued until the $50,000 was exhausted by the end of 1989, at which point the Nashua Trust loan went into default and ultimately was foreclosed.

■ At no time prior to August 9, 1989, or indeed until the end of that year, did the plaintiffs take any action or give any notice to the defendant that they were "calling" the "loan" or the "investment" in default and

4. Again, no mention is made of the February 1989 notes and mortgages. Also, although the note and mortgage also referred to "investment in land on Route 11–A" in actual fact the monies advanced by the plaintiffs were used to pay off a defaulted prior mortgage on the Route 202 parcel of the project property.

5. The plaintiffs of course as co-makers were directly and equally liable to Nashua Trust with the defendant had the loan gone into default.

demanding repayment on an accelerated basis. Accordingly, there was no matured debt or investment upon which repayment was due as of the time of the August 8, 1989 meeting nor as of the August 9, 1989 advance of the additional $51,849.83. Thus, it cannot be found based on this record that the plaintiffs "renewed" the loan or investment as of that date in any meaningful sense relevant to § 523(a)(2)(A) of the Bankruptcy Code, even if the Court should find that the defendant could no longer rely on the December 1980 repayment due date under the 1988 agreements.[6]

There was a good bit of inquiry and testimony elicited during the April 4, 1994 hearing as to whether the transactions between these parties involved only "one project" or whether there were separate agreements at the outset, at the end of 1988, as opposed to an additional and separate agreement in August of 1989. However, the issue as thus presented is misleading and not relevant in the circumstances.

■ There is no question in my mind in this record that all parties looked upon the transaction as being a continuing transaction relating to one project in which it was not unexpected that there might have to be additional advances down the road as various problems and obstacles were encountered. In that sense the meeting and discussion of the advance of the additional monies in August of 1989 was simply a part of that ongoing process.

The question however is not whether the foregoing was the understanding of the parties but rather whether there was any matured "loan" or "investment" as of the date of the fraudulent misrepresentation which resulted in any relevant renewal or extension in conjunction with the additional advance by the plaintiffs in August of 1989.

■ The Court finds and concludes that there was no "renewal" of an entire matured loan or investment transaction by the events that transpired in August of 1989 between the parties. While a simple demand loan or a traditional revolving loan constantly being drawn down can be considered to be "renewed" on a daily basis, the factual situation in the transaction between these parties is far from that paradigm of nondischargeability. Even the February 1989 notes do not purport to be demand notes. Moreover, the testimony in the record indicates clearly that the parties themselves never considered the question of "renewal" as being relevant or as an option in August of 1989. At most, the plaintiffs through their testimony indicated that had they known of the falsity of the representations made at the August 8, 1989 meeting they would have "considered taking appropriate action". That in turn would have resulted in confronting the question of whether they were entitled to repayment under their hybrid transaction prior to the December 1990 outside date. Neither the defendant nor the plaintiffs thought in those terms during 1989 and I believe and conclude that the concept of "renewal" arose only as an afterthought after the project had failed and the debtor had gone into bankruptcy.

*DECISION ON RECONSIDERATION*

With the foregoing findings and conclusions in place the Court must now confront the legal question as to the applicability of the *Goodrich* decision in this case and whether the court's original judgment should be reaffirmed or vacated.

The *Goodrich* decision in terms of its actual holding only applies to § 523(a)(2)(B) and is based largely upon the specific enumeration of elements in that subsection. That enumeration of elements does not exist in § 523(a)(2)(A). The Court of Appeals opinion in *Goodrich* begins by quoting the specific provisions of § 523(a)(2)(B) and then in its concluding comments stated:

> The statute is quite detailed in its conditions for nondischargeability. Had Congress wished to add "damage" as an element, it could easily have done so, especially since some of the decisions favoring this requirement were issued before the elaboration and reenactment of section 523(a)(2)(B) in 1978.

\*     \*     \*     \*     \*     \*

---

6. As noted above, there is a serious question of whether the December 1990 "outside date" for repayment to the plaintiffs had been abrogated by the February 1989 notes and mortgages.

Congress enacted a detailed statute without an explicit damage requirement. In the face of conflicting policies for and against, there is no warrant for the court to add such a requirement.

(999 F.2d at 25–26)

■ Subsection 2(A) of § 523(a)(2) on the other hand simply speaks in terms of "actual fraud" which has always been understood to incorporate the common law development of that concept. As Judge Devine of this District noted in a § 523(a)(2)(A) case in *In re McIntyre*, 64 B.R. 27, 29 (D.N.H.1986):

The relevant portion of the Bankruptcy Code upon which plaintiff relies renders nondischargeable any debt obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition," 11 U.S.C. § 523(a)(2)(A). Successful proof of a claim that a debt is nondischargeable under this section of the Bankruptcy Code requires proof of actual fraud, as contrasted with mere fraud implied in law. 3 *Collier on Bankruptcy* ¶ 523.08[5], p. 523–53 (1984). The elements of actual fraud include (1) a false representation by the debtor; (2) known to be false at the time it was made; (3) made with the intention and purpose of deceiving the creditor; (4) which was reasonably relied on by the creditor; and (5) which resulted in loss or damage to the creditor as the proximate result of the false representation. *In Re Leger*, 34 B.R. 873, 877 (Bankr.D.Mass.1983). *See also Commonwealth of Massachusetts v. Hale*, 618 F.2d 143, 147 (1st Cir.1980); *In re Salett*, 53 B.R. 925, 928 (Bankr.D.Mass.1985); *In re Hill*, 44 B.R. 645, 646 (Bankr.D.Mass. 1984).

It can be argued notwithstanding the foregoing that the analysis and rationale employed in *Goodrich*, while perhaps dicta with regard to subsection (2)(A), nevertheless

should support employing a like legal standard under the (2)(A) proviso. The Court in *Goodrich* does make a point of a permissible policy choice by Congress to deny discharge relief to a debtor who has "caused the trouble by making a materially false statement with intent to deceive" in connection with renewal of a loan. 999 F.2d at 26. The Court also cites as *Accord* the decision in *In re Gerlach*, 897 F.2d 1048 (10th Cir.1990), with regard to the holding that detriment or damage in the sense of ultimate loss is not required for nondischargeability. The *Gerlach* decision itself was a § 523(a)(2)(A) case which refused to require proof of damages on the basis that dischargeability is an "all or nothing" proposition. 897 F.2d at 1051.[7]

■ The question of the ultimate approach to be taken by the Court of Appeals with regard to subsection (2)(A) is a difficult question. My judgment is that ultimately the Court would recognize that (2)(A) does not have a specific enumeration of elements, which was at the heart of their decision on the appeal before them in the *Goodrich* case, and that therefore the Court would consider the question is still open with regard to the (2)(A) proviso. They would also have to confront the fact, dramatically illustrated by the present case, that factual situations of misrepresentation under subsection (2)(A) are far different in scope and context than the rather formalized situation in subsection (2)(B) cases which normally involve submission of a written financial statement to a "banker in pin stripes" for approval or renewal of a loan transaction. While Congress may well have considered the latter situation to require less of a showing, by the typical financial institution involved in such cases, provided the representation was embodied in a formal written document, that policy choice does not necessarily translate itself inescapably to the subsection (2)(A) situation.[8]

---

**7.** The *Gerlach* court however later also stated that the debt in issue in its case was nondischargeable only "in an amount which [the court] can reasonably estimate as obtained by the fraud." 897 F.2d at 1052.

**8.** Indeed, as I noted in *Sansoucy, supra,* Congress deliberately provided for *different* dis-

chargeability treatment for cases involving formal financial statement situations. The Court also notes that the great majority of cases involving subsection (2)(B) in fact have involved Banks or other financial institutions as contrasted with the "ad hoc" business negotiations and dealings more typical of the subsection (2)(A) cases.

In the present case, however, even if the requirement as phrased in *Goodrich* is deemed to be applicable to subsection (2)(A), the facts in this case do not establish the "detriment by renewal of the loan" requirement. No matter how broadly that concept or standard might be construed, it still does not describe what actually transpired between the doctors and the debtor in the .case before this Court. These parties engaged in a hybrid transaction in which their ultimate rights and obligations at best could only be established through substantial litigation. The facts certainly do not approximate the "cut-and-dried" loan renewal situation involved in the *Goodrich* case. In that case the loan in question had matured and it was established in the record that the Bank would not have renewed the loan had it known of the falsity involved in the financial statement presented to it. The loan transaction was a common line of credit, i.e., a "revolver" loan in common parlance, in a commercial setting in which there are well-established rules of the game.

The "lender" in *Goodrich* certainly was not a "co-maker" of the loan obligation sought to be rendered nondischargeable. On these facts therefore the Court can avoid the ultimate question as to whether *Goodrich* as a matter of law will also be applied as to cases under § 523(a)(2)(A). While I recognize that the plaintiffs here held an indemnification promise from the defendant that does not negate the fact that as co-makers on the loan to Nashua Trust they had to determine whether to carry that loan or default on the same entirely independent from the question of their dealings with the defendant. What is distinctively different and crucial in the present case is that the plaintiffs' actions throughout have to be viewed in the light of the hybrid deal they negotiated. To the extent that they can be viewed as "lenders" under the fallback provisions of their agreements they nevertheless have to at the same time be viewed as "investors" under the same agreements looking for 15 percent (later 45 percent under the August agreement) of the profits from their joint enterprise. It therefore does not accord with reality to find that they were merely "extending credit" or "renewing a loan", by the August 1989 agreement and advance of funds, within the general provision and meaning of § 523(A)(2) of the Code.[9] Even under *Goodrich*, the plaintiffs in the present case would not prevail.

This leads to the further conclusion, *a fortiori*, that if *Goodrich* does not apply to § 523(a)(2)(A), and that statutory provision should be construed in accordance with the decision in *McIntyre, supra*, requiring a showing of "loss or damage to the creditor as the approximate result of the false representation" (64 B.R. at 27) the plaintiffs in the present case equally cannot prevail. There is no showing whatsoever in the record that had the plaintiffs done anything different following the August 8, 1989 meeting they would have suffered any lesser loss.

Accordingly, an amended final judgment shall be entered separately denying the motion for reconsideration and reaffirming the nondischargeability of the $51,849.83 and reaffirming the dischargeability of all other obligations owing to the plaintiffs by the debtor.

---

9. There is nothing wrong of course in our economy with negotiating—if you can get it—a 45 percent return on an investment. But a 45 percent, or even 15 percent, return in profits of a real estate project does not come without some risk. And here the risk came home to roost with the collapse of the real estate boom in New Hampshire at the end of the 1980's. Both the plaintiffs and the defendant were caught in that crunch and the project failed. That being so I do not believe that Congress intended by § 523(a)(2)(A) of the Code to allow shifting of the entire risk to a debtor involved in such a hybrid transaction once bankruptcy ensues.