**In re Lucien E. FORBES and Virginia L. Forbes, Debtors.**

**FOUR QUEENS ENTERPRISES, INC., d/b/a Q–Travel, Plaintiff,**

**v.**

**Lucien E. FORBES, Defendant.**

Bankruptcy No. 92–10615.
Adv. No. 92–1103.

United States Bankruptcy Court,
D. Rhode Island.

Jan. 29, 1996.

---

Michael S. Devorkin, Doar Devorkin & Rieck, New York City, for plaintiff.

Russell D. Raskin, Raskin & Berman, Providence, RI, for defendant.

## DECISION AND ORDER DETERMINING DEBT TO BE DUE AND NONDISCHARGEABLE

ARTHUR N. VOTOLATO, Bankruptcy Judge.

This adversary proceeding was heard on January 12, 13, April 24, and May 22 and 23, 1995. The dispute is over a bill for travel services rendered more than seventeen years ago to Lucien Forbes by the Plaintiff (Q–Travel). It is alleged that Forbes owes the Plaintiff $26,402 and that, with interest, this debt had ballooned to $76,402 as of the date of Mr. Forbes' Chapter 7 bankruptcy petition, in February 1992. The Plaintiff also contends that the obligation is nondischargeable under 11 U.S.C. § 523(a)(2)(A), because it was incurred as the result of "false pretenses, a false representation, or actual fraud." The Debtor denies any fraud or deception in his dealings with the Plaintiff, and contends, in any event, that on October 12, 1979, the debt was satisfied by the delivery to the Plaintiff of 21,942 carats of blue topaz uncut stones. For the reasons discussed below, we find that the obligation still exists, and conclude that it is nondischargeable under § 523(a)(2)(A).

## BACKGROUND AND TRAVEL

In December 1977, Lucien Forbes made his initial business and personal travel arrangements with Q–Travel.[1] A typical transaction between these parties took place as follows: Forbes would call Q–Travel and explain his travel needs. Q–Travel would make all arrangements and then deliver the tickets, reservations, confirmations, etc., to Forbes at a place of his choice, or have them available upon check-in at the airport ticket counter. Thereafter, Q–Travel would invoice Forbes for the services rendered, and the bills would eventually get paid. Unlike his father who was also a Q–Travel customer, Lucien Forbes was never a prompt payer, and it was not uncommon for Q–Travel to render additional services to him while outstanding, and probably overdue bills, were still unpaid.

The parties did business in this fashion for approximately a year and a half, until Forbes' debt to Q–Travel increased noticeably, and payments became more sporadic and delinquent. In June 1979, when the outstanding balance approached $16,000, Q–Travel stopped providing services to Forbes

1. Q–Travel is a division of Four Queens Enterprises, Inc. Both entities are owned and operated by Charles Mattman.

on credit. To reinstate his former credit arrangement, Forbes sent Q–Travel two checks, one dated June 19, 1979, in the amount of $7,500, and the other dated June 18, 1979, in the amount of $9,750. These checks, drawn on a Panamanian bank, from an account called "Swiss Bank Corporation," were supposed to bring Forbes current with Q–Travel.

Q–Travel deposited both checks, immediately reinstated its credit extension policy, and provided Forbes with $9,205 in additional travel services. In early September 1979, Q–Travel received notice that both checks had failed to clear and were uncashed. One was returned for insufficient funds and the other was marked "Acct. Closed." (*See* Plaintiff's Exhibits # 10 & 11). Again, Q–Travel stopped extending credit and made demand upon Forbes for the new outstanding balance of $26,402, which is the subject of this litigation.

In an effort to resolve this "embarrassment" and to again resurrect his credit standing with Q–Travel, Forbes offered to deposit a quantity of unfinished, semi-precious, blue topaz gems with Q–Travel as collateral, until he was able to raise sufficient funds to make good on the dishonored checks and to pay the overdue balance. On October 12, 1979, Forbes, Mattman, and Mattman's jeweler, Lewis Kuhn, met at Kuhn's office in New York City, where Forbes produced 21,942 carats of rough blue topaz for inspection. At the conclusion of the examination, the parties entered into a written agreement which provided, inter alia, that "[t]hese stones are to be held as collateral against Mr. Forbes indebtedness to Q Travel in the amount of $26402.30 [sic] as of September 30, 1979." The agreement also stated that "these stones will be held by the William L. Kuhn Co., Inc. as agent for a reasonable length of time (30 days) in order to give Mr. Forbes the opportunity to liquidate his indebtedness to Q Travel.... After 30 days from this date the stones will be turned over to Q Travel."

Thereafter, according to Charles Mattman, he was unable to locate or contact Forbes and, except for one communication just ten days after the agreement was signed, Mattman was unable to reach Forbes at any of the addresses or phone numbers provided by Forbes. On August 2, 1989, after a ten year absence, Q–Travel filed an action against Forbes in the New York Supreme Court. Forbes moved to dismiss the Complaint on the ground that the statute of limitations had expired, but on November 18, 1992, after an evidentiary hearing, the New York Supreme Court (Eugene L. Nardelli, J.) denied the motion on the ground that Forbes had not been residing in New York, that his whereabouts were unknown, and that he was not amenable to service of process from 1979 to 1984.[2] On February 28, 1992, Forbes filed the instant bankruptcy case, wherein he listed Q–Travel's claim as "fixed and liquidated." It is noteworthy that before Q–Travel's objection, Forbes *did not* describe the claim as disputed, or that it had been paid, or that the statute of limitations expired, all of which he now strenuously asserts to be the case.

### DISCUSSION, FINDINGS, AND CONCLUSIONS

■ The first issue to be resolved is whether Forbes is still indebted to Q–Travel, or whether the obligation was satisfied in 1979 by the delivery of the topaz stones. If it is determined that Forbes owes the money, we will then be required to rule upon the dischargeability of the debt. The first issue, and the related question of the effect of Q–Travel's retaining the gems for over seventeen years, requires the application of state law principles, while the second question involves Federal law.

*Is There a Debt Owed to Q–Travel?*

■ In *Klaxon Co. v. Stentor Electric*, the United States Supreme Court held that in diversity cases Federal Courts should apply the forum state's choice of law principles in cases involving state law issues. 313 U.S.

---

**2.** While Forbes spent a lot of time and effort in this proceeding attempting to retry the issue of his availability for service of process during the time in question, we will disregard all such evidence and adopt the New York Supreme Court's findings and conclusions on the issue of Forbes' unavailability.

487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In *In re Merritt Dredging Co., Inc.,* the Fourth Circuit held that, in the absence of a compelling Federal interest to the contrary, when the dispute involves state law issues the Bankruptcy Court should apply state law, including the forum state's choice of law rules. 839 F.2d 203 (4th Cir.), *cert. denied, Compliance Marine, Inc. v. Campbell,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988). The holdings in *Klaxon* and in *Campbell* enhance predictability in the resolution of state law issues in the Federal Court, and that is the policy that will be followed by this Court. *See also In re Morris,* 30 F.3d 1578 (7th Cir.1994).

■ The Rhode Island choice of law statute provides that "perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected." *R.I.Gen.Laws* § 6A–9–103. Under this test New York law clearly applies here, because the collateral has remained in New York for the entire time in question. New York law would apply even under a "transactional" test, since the security agreement was formed and executed in New York, the collateral was delivered in New York, and Q–Travel filed an action to collect the debt in New York.

■ Having said that, we will consider the elements necessary to create an enforceable security interest under New York law, i.e.: (1) the collateral must be in the possession of the secured party, or the debtor must have signed a security agreement; (2) value must have been given; and (3) the debtor must have rights in the collateral. N.Y.U.C.C.Law § 9–203. On the facts before us, the first two elements are clearly satisfied, but the third was the subject of conflicting testimony.[3] After much cajoling on cross-examination, Mr. Forbes conceded that in his earlier testimony he did not recall who owned the topaz deposited as collateral, but eventually remembered that it was owned by J.G. Mar-

keting, a company with which he was doing business in October 1979. After Forbes' recollection was thus refreshed, William Segal testified that he owned J.G. Marketing, and that he sold the stones in question to Forbes in October 1979. In light of this evidence, we must find that Forbes, as the owner of the stones, had the right to pledge them as collateral.

■ The Debtor also contends, alternatively, that the stones were not given as collateral, but were tendered as payment of the debt. This argument contradicts the language of the October 12, 1979 agreement which provides that the "stones are to be held as collateral against Mr. Forbes' indebtedness. . . ." (Defendant's Exhibit # 105). Furthermore, the testimony regarding the events surrounding the formation of the agreement, the subsequent conduct of Charles Mattman vis-a-vis the collateral, Forbes' description of this debt as "fixed and liquidated" in his schedules, and the language in his post-trial memorandum, all indicate that the intention of the parties was to pledge the stones as security, until Forbes raised the cash to pay the debt.

■ Leaving no stone unturned, Forbes next argues that because Q–Travel retained possession of the collateral for such a long time, it should be deemed to have elected to apply the stones as payment for the debt. In New York it is clear that such an election under N.Y.U.C.C. § 9–505(2) is not valid unless and until the secured creditor gives written notice to the Debtor. This prerequisite was not accomplished by Q–Travel, and so it never acquired the right to apply the collateral as payment for the debt. Section 9–505 is entitled "Compulsory Disposition of Collateral; Acceptance of the Collateral as Discharge of Obligation" and states in part:

(2) . . . a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. *Written notice of such proposal shall be sent to the debtor* if he has not signed after default

**3.** Strangely, the evidence in conflict involved the testimony of Lucien Forbes and one of his own witnesses, William Segal.

a statement renouncing or modifying his rights under this subsection. . . .

N.Y.U.C.C. § 9–505(2) (emphasis added). Most courts have found that a creditor who retains collateral for an unreasonably long time can be deemed to have retained the collateral in full satisfaction of its debt under § 9–505(2), even though the creditor failed to comply with the notice requirement of the statute. *See Lamp Fair, Inc. v. Perez–Ortiz,* 888 F.2d 173, 176–77 (1st Cir.1989); *Millican v. Turner,* 503 So.2d 289, 291 (Miss.1987). Unfortunately for Mr. Forbes, however, New York is in the minority of jurisdictions which hold that an election by a secured party to retain collateral in satisfaction of the debt will not be implied, in the absence of written notice to the debtor pursuant to § 9–505(2). *S.M. Flickinger Co., Inc. v. 18 Genesee Corporation,* 71 A.D.2d 382, 423 N.Y.S.2d 73 (N.Y.A.D.1979); *see also Chrysler Credit Corp. v. Mitchell,* 94 A.D.2d 971, 464 N.Y.S.2d 96 (N.Y.A.D.1983); *Warnaco, Inc. v. Farkas,* 872 F.2d 539 (2d Cir.1989). A Federal District Court applying state law summed up this minority viewpoint as follows:

> The Uniform Commercial Code entitles a creditor to retain and protect collateral received from a debt as security until the debt is satisfied. . . . § 9–207. Such retention cannot be equated under the statute with an election to satisfy the debt with the collateral only, in the absence of statutorily required written notice from the creditor that the creditor has made such an election. U.C.C. § 9–505(2).

*Bank of Boston Int'l v. Arguello Tefel,* 644 F.Supp. 1423, 1428 (E.D.N.Y.1986).

■■■ Forbes argues that the October 12, 1979 agreement contains the written notice required by § 9–505(2) because it provides that the gems will be turned over to Q–travel after 30 days. We disagree, and rule that the election to accept collateral in satisfaction of the debt must occur *after* default, *and* by a separate document. *See* N.Y.U.C.C. § 9–505(2). In the instant case the default did not occur until "a reasonable length of time" (more than 30 days) after the October 12, 1979 agreement. Q–Travel has not provided notice as required under § 9–505(2) *after* Forbes defaulted, and as New York follows the minority view, Q–Travel cannot be deemed, because of the passage of time, to have elected to accept the collateral in satisfaction of the debt.

Additionally, although the time may at first appear to be excessive, we find in the circumstances that Q–Travel did not act unreasonably. Forbes' whereabouts were unknown between 1979 and 1984, and after his reappearance in 1989,[4] Q–Travel pursued its rights by filing a complaint which was found to be timely filed by the New York Supreme Court. *See Four Queens Ent. v. Forbes,* No. 16859/89 (New York Supreme Court, New York County, Dec. 13, 1991). Under the facts of this case and based upon the applicable law, we cannot find that Q–Travel accepted the stones in satisfaction of the debt, or that Q–Travel should lose on a waiver or estoppel theory.

Forbes' additional argument that Q–Travel did not dispose of the collateral in a commercially reasonable manner under N.Y.U.C.C. § 9–504[5] is also without merit. To begin with, Q–Travel did not dispose of the stones at all, but has possession of them to this day. Although one of Q–Travel's available remedies after default was to sell the collateral at public or private sale under Section 9–504, it did not do so, but instead elected to sue on the obligation, an option that is clearly available to this creditor. *See Flickinger,* 423 N.Y.S.2d at 75.

■■■ Forbes also argues that Q–Travel is liable for failing to use reasonable care to protect the value of the collateral, by continu-

---

4. The parties have not addressed what happened between 1984 and 1989, and we find it is not relevant in light of Judge Nardelli's finding that the complaint was timely filed.

5. Section 9–504 states in part:
   Secured Party's Right to Dispose of Collateral After Default; Effect of Disposition

(1) A secured party after default *may* sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.

N.Y.U.C.C. § 9–504 (emphasis added).

ing to just hold on to the stones in the face of declining values. According to N.Y.U.C.C. § 9–207(1), "a secured party must use reasonable care in the custody and preservation of collateral in his possession." As a general rule that duty relates to physical care. *Restatement of Security § 17 comment a; Restatement of Security § 18, comment a.* Although New York courts have held that in certain instances a secured creditor must preserve the economic value of collateral under § 9–207, those cases involve instruments pledged as collateral, not tangible personal property. *See Grace v. Sterling, Grace & Co.,* 30 A.D.2d 61, 289 N.Y.S.2d 632 (N.Y.A.D.1968); *Bank of Boston Int.,* 644 F.Supp. 1423. Here, while the extensive testimony concerning the value of blue topaz was interesting, we find, based on the choices available to and those made by Mattman, that such evidence is irrelevant to this dispute. Also, given Forbes' inconsistent testimony as to the value of the stones, and the conflicting testimony of Messrs. Segal and Hegeman, the Court is unable to estimate what these stones were worth on October 12, 1979, or at what point their value began to plummet.[6]

Even if we accepted the contention (which we do not) that the stones could be analogized to stocks or convertible debentures, the cases involve negligence by banks and stockbrokers who possess special skills and where the standard of care is that of a reasonably prudent person in the same field or class. *See id.* at 639–40. Charles Mattman and his agents never claimed to be knowledgeable about semi-precious stones, and have expressly disavowed such skills. Also, Mattman told Forbes "emphatically" that he had no intention of taking possession of the collateral, because he was not interested in getting into the topaz business, and that neither he nor Mr. Kuhn were knowledgeable as to the value of semi-precious stones.[7]

---

**6.** It is undisputed that the stones are virtually worthless today, and it is clear that they have been worthless for a long, but undetermined, period of time. It is also highly likely that this was a major factor in Mattman's decision not to attempt to satisfy the debt with the collateral.

**7.** In every instance where there is a material conflict between the testimony of Forbes and

Furthermore, Forbes, who was well versed in the rough topaz market, had the opportunity, and indeed the obligation to protect the alleged value of the stones and his own interest therein, by requiring the disposition of the collateral under *N.Y.U.C.C. § 9–507,* but he failed to do so. This, more than the conflicting testimony of experts, is compelling evidence that Forbes knew when he delivered the collateral that it was not worth very much.

Based upon all of the foregoing, we find that there was a debt owing to Q–Travel at the time of Mr. Forbes' bankruptcy, that was originally secured by the blue topaz stones (Plaintiff's Exhibit #59) which are now worthless, and that said stones were never accepted by the Plaintiff in satisfaction of the debt.

*Is the Debt to Q–Travel Nondischargeable in Forbes' Bankruptcy?*

To establish that a claim is nondischargeable under 11 U.S.C. § 523(a)(2)(A), the creditor must prove that: "(1) the debtor obtained property [or services] by means of a knowingly false representation or one made in reckless disregard of its truthfulness; (2) the debtor intended to deceive the creditor; (3) the creditor actually relied on the misrepresentation...." *See Commerce Bank & Trust Co. v. Burgess (In re Burgess),* 955 F.2d 134, 140 (1st Cir.1992). *See also McCallion v. Lane (In re Lane),* 937 F.2d 694 (1st Cir.1991), *aff'd.* 50 F.3d 1 (1st Cir. 1995); *Springfield Inst. for Sav. v. Parker (In re Parker),* 59 B.R. 721 (Bankr.D.Mass. 1986); *Federal Deposit Ins. Corp. v. Bombard (In re Bombard),* 59 B.R. 952 (Bankr. D.Mass.1986).

Very recently, the United States Supreme Court in the case of *Field v. Mans,* — U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), discussed reliance as follows:

Mattman, we reject Forbes' version and accept Mattman's. Mr. Forbes' testimony is so evasive and fraught with inconsistencies that it is difficult to give credence to hardly anything he says, whether it is critical or trivial. Charles Mattman, on the other hand, impresses this Court as a truthful, straightforward witness.

"§ 523(a)(2)(A) requires *justifiable,* but not *reasonable,* reliance." (Emphasis added.) *Id.* at ——, 116 S.Ct. at 446. And, while the reasonableness of the reliance is not irrelevant, "the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about the reliance in fact." *Id.* at ——, 116 S.Ct. at 446. In defining justifiable reliance, the Court quoted extensively from the Restatement (Second) of Torts:

> "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than to the application of a community standard of conduct to all cases."

*Field,* —— U.S. at ——, 116 S.Ct. at 444 (quoting Restatement (Second) of Torts, § 545A, Comment b (1976)). The *Field* decision lessens the Plaintiff's burden from what it was previously. Additionally, the required elements need only be established by a preponderance of the evidence—not the prior clear and convincing standard. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Citibank, N.A. v. Williams (In re Williams),* 159 B.R. 648, 660 (Bankr.D.R.I.1993), *remanded on other grounds,* 190 B.R. 728 (D.R.I.1996).

The Plaintiff contends that when Forbes delivered the two checks in June 1979 to induce the extension of additional travel services on credit, he knew or is charged with knowledge that the checks would not clear. Forbes' testimony concerning the Panamanian bank account upon which the two checks were drawn is inconsistent, at best, and more likely, false. Initially, Forbes stated that he thought the checks were drawn on a "Freehold Account," a German company in which he owned an interest. He testified that he controlled the account, that he was in regular contact with the account "Manager"[8] in Panama, and that based on these communications he believed there were

sufficient funds to cover the two checks. He also testified that when he learned that the checks were dishonored, he promptly contacted the Manager and actually went to Panama, only to learn, "to his surprise," that the account was closed. He also stated that until October 12, 1979, he had been routinely traveling in and out of the United States, that he used the account to pay his travel expenses, that he ran his business from this account, and that no other checks were returned unpaid. Mr. Forbes explained that he has no documents to support his testimony, because all of the records concerning this account were stored in Panama and their location is unknown. Additionally, both the Manager and the Swiss Bank Manager (both unidentified), are deceased, he says.

Forbes later testified that the Panamanian account belonged to Agro International Services, Inc. ("Agrosa"), in which he had no ownership interest, but that he was an "agent" for Agrosa and had a "power of attorney" with authority to sign Agrosa checks. He stated that he was the only "user" of the account and had intimate knowledge about its activity, balances, etc. The only other person with check signing authority was the Manager, and he would only write checks to pay incidental corporate expenses, such as "tax stamps." Forbes testified that he was in contact with the Manager at least monthly to discuss the account activity, that he talked to the Manager prior to delivering the disputed checks to Q–Travel, and that he believed there were sufficient funds to cover the Q–Travel checks.

All of Lucien Forbes' testimony regarding the checks and the Panamanian account is completely unverified and self-serving, and does not even begin to support his assumption that the Q–Travel account had been brought current, or that the new extension of credit would be paid within a reasonable time (even by his standards). If Forbes had the control over the Panama account as he professes, no acceptable reason has been advanced why he would not have known that there were insufficient funds or, more importantly, that the account had been closed. Plaintiff's Exhibit # 44, a September 22, 1978 letter from the Account Manager in Panama to Forbes, calls into question Forbes' alleged

---

**8.** According to Forbes, this "Manager" was employed to handle and process corporate records in Panama for many companies doing business abroad.

control over and knowledge of the Panama account, and his connections with Agrosa. The letter regarding billings of Q–Travel sent to Panama for payment states: "[w]e regret to advise that temporarily the disposable funds of Agrosa in Panama, are such that these bills cannot be promptly met. As fiduciaries for the noted firm we are attempting to reach principals to effectuate the necessary funding." (Plaintiff's Ex. # 44). We find that Forbes tendered the checks in question to Q–Travel with the knowledge that they would not clear, and that he knew he would not be able to cure the default. During the period in question Forbes had little or no income, and no other means to pay the debt. If our finding of Forbes' actual knowledge is disturbed on appeal, we also find that his misrepresentations were made with such reckless disregard for the truth that the same result should obtain. We also find that Forbes delivered the checks specifically to induce Q–Travel to extend additional travel service on credit.[9] *See In re Williams,* 159 B.R. at 660–661. It is the conclusion of this Court that Forbes' actions, cumulatively, constitute fraud within the meaning of the Bankruptcy Code.

It is also clear that Q–Travel relied on Forbes' misrepresentations when it provided the additional $9,205 worth of travel services on credit, immediately upon receiving the checks in question. Forbes contends, however, that Q–Travel's reliance was not reasonable, and cites *Williams* in support of this proposition. As just announced by the Supreme Court, however, discussed *supra* at 516–17, our focus now is not on whether the reliance was *reasonable,* but whether the reliance was *justified.* On the facts before us, and under *either* standard, we find that Q–Travel and Charles Mattmann relied on Forbes' representation that sufficient funds were on deposit to cover the checks, and that credit was extended.

The evidence shows that Mattman was impressed (and well he had the right to be)[10] by Forbes' apparent substance and family background. Based on the entire record, Q–Travel's reliance on Forbes' false representa-

tions was clearly *justified,* and for whatever it is worth post-*Field,* Mattman's reliance was also *reasonable.* Based upon all of the foregoing, we find that the $9,205 (new money) debt to Q–Travel is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

■ In light of that ruling, we are required to conclude that the *entire* debt due Q–Travel is nondischargeable, rather than just the amount of credit extended in reliance on the misrepresentation in question. *Shawmut v. Goodrich (In re Goodrich),* 999 F.2d 22 (1st Cir.1993). In *Goodrich,* the Debtor submitted a false financial statement to obtain a renewal of an existing line of credit. Even though the original loan was not obtained by fraud, the First Circuit held that the entire debt was nondischargeable, as "the only detriment that need be shown is the renewal of the loan." *Id.* at 25. While *Goodrich* dealt with § 523(a)(2)(B), the same reasoning applies here. *But see, In re Attalla,* 176 B.R. 650 (Bankr.D.N.H.1994), where the Bankruptcy Court questioned the applicability of *Goodrich* under § 523(a)(2)(A), and declined its application where the evidence failed to establish a renewal of a matured loan. Here, upon receiving the checks from Forbes, Q–Travel promptly extended additional travel services on credit, in reliance on the representation by Forbes that the account had been brought current. Accordingly, we conclude that the facts here are sufficiently similar to be covered by *Goodrich,* and hold that the renewal of credit is a sufficient detriment to render the entire debt, plus interest, nondischargeable, and it is so ORDERED.

Enter Judgment consistent with this opinion.

---

9. Mr. Mattman testified that Forbes asked for even more travel services on credit after giving the blue topaz as collateral, but that request was declined.

10. Even under this Court's critical observation of Mr. Forbes, we found ourselves on the verge of believing that he was probably going to be the

developer/creator of Russia's entire new telecommunications system. See Transcript of January 13, 1995 hearing prepared by Michael S. Devorkin, Esq., at 8–10. Without question, Mr. Forbes is a truly effective salesperson regardless of what he is trying to sell.