**In re DURASTONE COMPANY, INC., Debtor.**

**Bankruptcy No. 93–10653.**

United States Bankruptcy Court, D. Rhode Island.

Aug. 3, 1998.

Kevin Brill, Peabody & Brown, Providence, RI, for debtor.

Zala L. Forizs, Blasingame, Forizs & Smiljanich, P.A., St. Petersburg, FL, for Nandy L. Sarda.

Charles A. Pisaturo, Jr., William T. Murphy Law Offices, Inc., Providence, RI, for William J. Messier Trucking, Inc.

### DECISION AND ORDER ALLOWING PROOF OF CLAIM, AND DENYING COUNTERCLAIM

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Debtor's Objection to the claim of William J. Messier Trucking, Inc. ("Messier"). Messier timely filed an unsecured, nonpriority claim in the amount of $53,439 for contract trucking services performed for the Debtor. *See* Durastone Ex. 30. The Debtor contends that Messier is owed $29,146, at most, and also asserts a $184,579 counterclaim. For the reasons discussed below, we find that: (1) Messier's claim is allowed in the amount of $51,796; and (2) the Debtor's counterclaim is denied in its entirety.

### BACKGROUND

The Durastone Companies [1] ("Durastone") manufactured, sold, and sometimes installed, pre-cast concrete products used in the construction of roads and buildings, and Messier provided hauling services for the period January 1, 1990 through December 31, 1990, delivering Durastone product to job sites and to Durastone customers. On March 15, 1993, Durastone Flexicore Corporation and Durastone Company, Inc. filed for reorganization under Chapter 11. On March 17, 1995, Messier filed its proof of claim in the Durastone Company case and on June 29, 1995, the Debtor filed its objection. On October 10, 1995, Durastone Company, Inc. converted to Chapter 7; however, the confirmed plan [2] of Durastone Flexicore Corporation provides for payment of claims filed in the Durastone Company case, if the claim is "properly as-

1. The "Durastone Companies" consisted of: Durastone Flexicore Corporation and Durastone Company, Inc.

2. On February 12, 1996, the Court confirmed the Durastone Flexicore plan which provides for

sertable" against Durastone Flexicore Corporation. *See* Messier's Ex. M, Plan of Reorganization, p. 12. It is undisputed that Messier's claim is "properly assertable" in the Flexicore case.

Messier's claim consists of: (1) Unpaid invoices for November and December 1990, $28,008; (2) unpaid charges for "waiting time," $14,552; (3) shuttling charges for moving materials between Durastone plants, $4,260; (4) bad check deduction by Durastone, $1,575 (Durastone charged Messier with responsibility for accepting a bad check on a C.O.D. delivery); and (5) miscellaneous unpaid invoices for re-delivery charges, $14,126.

The offsets asserted by Durastone are: (1) Messier's failure to supply a dispatcher at Durastone's plant pursuant to the terms of the contract, $56,312; (2) a deficiency on a secured promissory note by Messier, $36,305; (3) the cost to replace tires on 10 trailers leased to Messier, $15,890; (4) liability insurance for the 10 trailers, $9,333; and (5) damages on the Tilcon Gammino contracts caused by Messier's failure to deliver product, $66,840. Durastone has contested every item vigorously, so we will deal with each one in detail.

### DISCUSSION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW
#### (A) MESSIER'S PROOF OF CLAIM

Pursuant to Fed.R.Bankr.P. 3001(f), a properly filed proof of claim is prima facie evidence of the validity and amount of the claim. *See also In re Colonial Bakery, Inc.,* 108 B.R. 13, 14 (Bankr.D.R.I. 1989); *In re Narragansett Clothing Co.,* 143 B.R. 582, 583 (Bankr.D.R.I.1992). In *Colonial Bakery,* we considered the procedure regarding objections to claims:

(1) pursuant to Bankruptcy Rule 3001(f), the claimant establishes a prima facie case against the debtor upon the filing of its proof of claim; (2) the objecting party is

payment in full to all unsecured creditors, plus post-confirmation interest at the rate of 4.37% per annum. See Messier's Ex. M, Plan of Reorganization, at 9–10.

then required to produce evidence to rebut the claimant's prima facie case; (3) once the objecting party produces such rebuttal evidence, the burden shifts back to the claimant "to produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence.' The ultimate burden of proof always rests upon the claimant...."

*Id.* at 15 (*citing In re Circle J. Dairy, Inc.,* 92 B.R. 832, 833 (Bankr.W.D.Ark.1988)) (*quoting California State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In re Fidelity Holding Co., Ltd.)*, 837 F.2d 696, 698 (5th Cir.1988); *see also In re Pontarelli,* 169 B.R. 499, 501 (Bankr.D.R.I.1994).

### (1) *Unpaid Invoices:*

Durastone consistently maintained that it never received Messier's invoices for November and December 1990, but at the outset of the hearing announced that it had no objection to this portion of the claim. Accordingly, this item is allowed in the amount of $28,008.

### (2) *Shuttling Charges:*

In the present context, *shuttling* is the moving of materials between Durastone plants, and it is not disputed that Messier performed such services. But Durastone argues that under Paragraph 2. E. of the Hauling Agreement, the rate for shuttling is $30 per hour, and not the $40 billed by Messier.

Paul Vanasse, Messier's dispatcher, testified that the agreement was that the shuttle charge was raised from $30 to $40 per hour when Messier used its own trailers, and that this modification was confirmed in writing by Durastone's President, Nandy Sarda. See Messier's Exhibit S, where Sarda states:

This is to confirm our agreement regarding your rental charge of $30/hour for Tractor and Driver, including all operating costs and insurance. Should we rent a flatbed trailer, the additional charge of $10/hour includes all operating costs and insurance.

Messier Ex. S. Initially, Durastone paid these charges but sometime thereafter, Mr. Sarda unilaterally withheld the shuttling charges from a subsequent Messier payment. The summary of invoices provided by Durastone, Durastone Exhibit 24, shows that each of the disputed shuttling charges was approved by a Durastone employee.[3] Based on the uncontradicted documentary record, we find the shuttling charges in question call for the $40 rate, and that Messier's claim for this item is allowed in the amount of $4,260.

### (3) *Waiting Time:*

The dispute over waiting time is one of the most contested items of Messier's claim. The hauling agreement provides that:

Durastone will attempt to minimize the unloading time at the job site. Wherever possible, Durastone will request the general contractor to allow for staging area at the job site for Messier to drop trailers. If the unloading time becomes excessive in comparison to past experience, then Messier will request additional compensation from Durastone at a mutually agreed charge. Messier, however, will have the responsibility to position trailers for unloading near the structure at the required times. The General Contractor has the responsibility to provide an access for the tractor/trailer.

Durastone Ex. 1, Hauling Agreement ¶ 3C. Durastone argues that waiting time is chargeable only if two conditions are met: (1) waiting time exceeds past experience; and (2) the parties mutually agree to the charge. Mr. Sarda contends that there was no agreement to pay waiting time after April 25, 1990, when he sent a letter to Messier outlining the conditions under which he would agree to pay waiting time. The letter states:

I recommend the following procedure.

1. Your truck driver must secure the names and signatures of the General Contractor's Superintendent with his designation of the time of arrival of the

---

**3.** Mr. Sarda made it clear on both direct and cross examination that he was "the boss" at Durastone, and that nothing was final without his approval. He stated that he had the sole

authority to sign checks and that if a Durastone check was issued, it meant that he had approved the charge.

loads at the jobsite[sic] and the time of the trucks departure.

2. Your truck driver must secure the General Contractor's explanation for the cause of the delay and his approval for backcharges to be sent to the contractor's office for any waiting charges in excess of normally allowed unloading time.

3. All this information must be clearly written to avoid any confusion or delay in securing payment for these backcharges from the contractor.

Durastone Ex. 25, Letter of April 25, 1990.

Messier argues that the contract clearly contemplates the payment of waiting time, and references past practices. Mr. Sarda defines "past practices" as those experienced with Delfarno Trucking, Durastone's previous hauler. Both Leo and William Messier (who impressed this Court as credible witnesses) stated that: (1) they worked for DelFarno as independent contractors; (2) they did hauling for DelFarno when DelFarno was Durastone's exclusive hauler; and (3) therefore, they were familiar with the circumstances under which waiting time was chargeable to Durastone. They both testified that the prior practice (with DelFarno) was to allow 3 free hours of unloading time on jobs where Durastone was installing the product, and two free hours on all other jobs. Additional time was chargeable waiting time. Donald Kinniburgh, a Durastone employee for twenty years and its plant manager during the time in question, testified that he was present at two meetings between Sarda and the Messiers where the hauling agreement was discussed before it was executed. He said that the paragraph concerning the waiting time (3C) was discussed and it was agreed that anything in excess of two hours would be compensable. He also stated that for the last eighteen years Durastone paid waiting time at $30 per hour and that the only requirement was that a job supervisor sign the delivery slip indicating the time the truck arrived and the time the truck departed.

Based on the undisputed evidence, we find that Messier has met its burden on the waiting time charges. Leo Messier testified that

Mr. Sarda's proposal in his letter of April 25, 1990 (Durastone Ex. 25) was never agreed to because it was completely unworkable. Leo Messier testified, credibly, that it was difficult enough to find a supervisor to sign the delivery slip, let alone get him or her to admit in writing that the contractor was responsible for a back charge on account of waiting time. Both parties agree that all invoices marked "FOB" are for delivery of product to non-Durastone job sites, and that two hours of free waiting time applies to such invoices. *See* Messier Ex. EE. On the other invoices, three hours of free time is applicable. It was also agreed to that a deduction of one-half hour applied if lunch time coincided with the waiting period. We agree with Messier's calculations and allow waiting time charges of $14,552.

### (4) *Bad Check Back Charge:*

On February 8, 1990, Messier delivered Durastone product to a Durastone customer, Coastal Restoration & Development Corp. The delivery slip issued to Messier by Durastone stated: "COD Collect." *See* Messier Ex. D. Messier collected a check in the amount of $1,575 from Coastal for the product delivered, and gave the check to Durastone. Durastone accepted and deposited the check, but on February 12, 1990, the check was returned marked "insufficient funds." Durastone deducted $1,575 from the next payment made to Messier, on the ground that Messier had clear instructions on how to handle C.O.D. deliveries, and that it was also industry custom to accept only cash or certified funds on a C.O.D. delivery. Because Messier departed from this practice and accepted a company check from Coastal Restoration, Durastone argues that Messier is liable for this loss.

The evidence, however, is that Durastone used various instructions for C.O.D. deliveries. Some delivery slips read "C.O.D.," others "C.O.D. Certified Check" and the one in question, "C.O.D. Collect." Additionally, Mr. Sarda testified on cross examination that the delivery ticket usually contained written instructions to the driver, indicating what kind of check to collect. The only documentary evidence that Messier had "clear instruc-

tions" on how to handle C.O.D. deliveries is a February 20, 1990, internal memorandum written by Bill Springer, Durastone's director of accounts, to Durastone dispatcher, Joe Lopes. *See* Durastone Ex. 8. Other than this after-the-fact, self-serving declaration by Durastone, Springer testified that he never gave Messier specific instructions about accepting C.O.D. payments. We give no weight to the memorandum as support for Durastone's position, and find that Durastone's instructions were neither consistent, clear, nor adhered to by Durastone. Additionally, the hauling agreement makes no reference to C.O.D. payments and sets no standard for responsibility by Messier in that regard. Finally, Durastone's acceptance of the Coastal Restoration company check from Messier, without comment or complaint, is a waiver of this item. Regardless of the instructions, it would be ludicrous to allow Durastone to accept the check, wait to see what happens, then after dishonor, order that Messier should bear the loss. For these reasons, we find that Messier has met its burden on this issue and this portion of its claim is allowed in the amount of $1,575.

### (5) *Miscellaneous Unpaid Messier Invoices:*

These invoices, submitted as Messier Exhibits E–I, total $14,126. In its post-trial memorandum Durastone states that it is only contesting $10,976, the total of the two invoices in Messier Exhibit I, for the re-delivery of 28 loads of Durastone product on April 11, 1990, and May 7, 1990, to a Durastone customer in Stanford, Connecticut.[4] Each invoice contains the following note: "Due to weather conditions job was cancelled[sic]. Trailers were dropped at sight[sic]. Redelivery charge." Durastone objects to these re-delivery charges, faulting Messier for not better coordinating its delivery schedule. Durastone argues that it is inconceivable that Messier would attempt to deliver twenty-eight loads to a job site in bad weather and that it would send twenty-eight tractors to pick up the twenty-eight trailers. Mr. Sarda

testified that Messier often sent too many trailers to a job site at the same time, and that if Messier had to leave trailers at the site because they could not be unloaded, it should have only been a few trailers at a time, so that when deliveries resumed the driver bringing the new load to the site could unload, and then "double stack" trailers for the return trip home. This method of piggy-backing trailers would have reduced re-delivery charges, according to Sarda.

Again, the evidence favors Messier. Joseph Lopes, Durastone's dispatcher during the time in question explained the procedure for delivery of product to various job sites. In all instances, the customer expecting product always dealt directly with Durastone which, in turn, relayed directions to Messier. There is no evidence that Durastone informed Messier that the delivery was canceled, and there certainly is no basis upon which to infer that Messier was authorized or had discretion to cancel a delivery order due to weather without Sarda's approval. Additionally, Clair Viera, Messier's bookkeeper, testified that these 28 trailers were initially dropped near, but not at the site, and that the tractors returned to Rhode Island. The tractors subsequently returned to Connecticut, for which the re-delivery charge was incurred, picked up the full trailers and brought them to the job site and unloaded. Then the tractors returned the empty trailers to Rhode Island. Obviously, there was more involved on the second trip than just picking up an empty trailer, as implied by Mr. Sarda. The re-delivery charges are proper and reasonable, the objection is bogus, and the re-delivery charges and miscellaneous unpaid invoices are allowed in the amount of $14,126.

### (B) *DURASTONE'S COUNTERCLAIM*

Durastone has also filed a counterclaim in excess of $184,000. Quite apart from the strong likelihood that this counterclaim is no more than an afterthought raised by Mr. Sarda in his belief that in business the best defense is a good offense,[5] the coun-

---

4. The April 11 delivery involved 13 loads, and on May 7, 15 loads were re-delivered.

5. In long, litigious cases, the parties get to know the judge, and vice versa. Since 1993 we have

terclaim also fails on the merits. Among the major shortcomings of this counterclaim are that: (1) Durastone did not list the claim in its schedule of assets, *see* Messier Ex. K;[6] (2) Durastone did not list this claim in its Disclosure Statement under the heading "Pending Litigation." *See* Messier Ex. L, Disclosure Statement, p. 14; (3) Durastone's only other mention of this claim since 1991 was by its counterclaim when sued by Messier on the same cause of action in State court; and (4) according to Joseph Lopes, the Durastone dispatcher during the time in question, "Messier was one of the best trucking companies used by Durastone."

■ Durastone has the burden of proof with regard to its counterclaim, and "[d]amages must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures, and cannot rely on speculation." *Kelley v. Medeiros* (*In re Kelley*), 131 B.R. 532, 536 (Bankr.D.R.I.1991); *National Chain Co. v. Campbell,* 487 A.2d 132, 134–35 (R.I.1985); *Reliance Steel Prods. Co. v. National Fire Ins. Co.,* 880 F.2d 575, 578 (1st Cir.1989). Messier has stipulated that Durastone is entitled to an offset of $10,725 for damaged product and unpaid trailer rental. Beyond this stipulated amount, we find for the following reasons that Durastone has not established *any* of the elements of its counter-claim.

### (1) *Failure to Provide Dispatcher:*

■ The Hauling Agreement provides:
C. Messier will maintain at Durastone's plant, on a full time basis, one (1) employee to coordinate the delivery of loads at no charge. This employee will be an experienced dispatcher experience[sic] in: coordinating all tractor and trailer activities, coordinating effectively with the Durastone staff and experienced in record keeping. . . .

Durastone Ex. 1, ¶ 2.C. It is undisputed that Messier did not provide the dispatcher as required under the contract, but it is also

clear that Durastone waived this provision in negotiations with the Messiers, and that the conduct of the parties was consistent with said waiver. *See URI Cogeneration Partners, L.P. v. Board of Governors,* 915 F.Supp. 1267, 1285 (D.R.I.1996) ("Waiver is the voluntary intentional relinquishment of a known right. It results from action or nonaction"). Additionally, "'contractual rights may be waived by conduct inconsistent with the express terms of the agreement.'" *Id.* (*citing Violet v. Travelers Express Co., Inc.,* 502 A.2d 347, 349 (R.I.1985)).

The parties agree that the hauling contract is essentially the same agreement that Durastone used with DelFarno Trucking, and that neither side was represented by counsel. Leo and William Messier both testified that during the negotiations they told Mr. Sarda they were too small an operation to comply with several of the requirements of the contract, i.e., the bonding requirement (¶ 7), the dispatcher requirement (¶ 2c), the overweight limits (¶ 2B), and the equipment needed to perform under the contract as drafted. Leo Messier stated that they "walked out" of the first meeting because they knew they could not perform under the contract being proposed by Sarda. Donald Kinniburgh, Durastone plant manager, Paul Vanasse, Messier's dispatcher, and Leo and William Messier were present at the negotiations with Mr. Sarda, and they all testified that Sarda told the Messiers that a dispatcher at the Durastone plant would not be required, notwithstanding the contract. The Messiers and Vanasse testified that Sarda asked that the clause stay in the written contract "to satisfy his salesman" and prior owner of the plant, Barney Baretta. The Messiers testified that it was with that assurance (among others), that they signed the contract, and we accept their version of the facts, notwithstanding Sarda's denial.

The record, particularly Sarda's conduct after the contract was signed, supports the conclusion that the dispatcher provision was waived. Most persuasive is the fact that during the entire term of the contract, Sarda

come to know that Nandy Sarda would not allow a $184,000 claim to lie fallow if it had any merit.

**6.** The schedule includes contingent and unliquidated claims totaling only $5,042. Messier Ex. K, Schedule B.

never once mentioned or sought to enforce the ·dispatcher provision, or to backcharge Messier for the salary Sarda was paying his dispatcher. The dispatcher provision was waived by agreement and by the conduct of the parties.

### (2) Trailer Tires:

It is undisputed: (1) that Sarda leased ten trailers to Messier under an oral agreement that was to run during the term of the hauling contract; and (2) that the trailers in question were not owned by Durastone, but rather by U.S. Concrete Systems, a Florida company in which Mr. Sarda had an ownership interest. Under the oral agreement, Messier would pay $225 per month to Durastone for each trailer and maintain liability insurance in the amount of $1,000,000. Sarda stated on direct examination that he installed ninety new tires plus a new spare on each of the ten trailers in question prior to delivery to Messier, but that when Messier returned the trailers, "the tires were in bad shape— 95% were illegal." Sarda now seeks the value of ninety tires at $187 per tire. In support, Mr. Sarda offered Exhibit 18, an estimate from Warren Tire, Inc. in the amount of $16,852 to replace 90 tires. Additionally, Robert E. Eliott, Jr. of Warren Tire testified that the estimate, although given recently, would still apply in 1991 because the price of tires has not increased significantly. He also stated that he never replaced ninety tires for Mr. Sarda, and that the average life of such tires is one and one-half years. Another Durastone witness, Denise DeVenuto, contradicted Mr. Sarda. DeVenuto, an employee of U.S. Concrete who still worked for Sarda when she testified, stated that she was responsible for shipping the trailers to Rhode Island and that the tires were not brand new, but were in "good condition" when delivered to Messier.

The following people were present when Messier picked up the ten trailers from the Durastone yard: Durastone Plant Manager, Donald Kinniburgh, William Messier, and Messier's dispatcher, Paul Vanasse. Kinniburgh stated that most of the tires on the trailers were worn, but that some were usable and legal, and that when delivered to Messier, many of the trailers were missing spare tires. This supports William Messier's testimony that some of the tires were workable and that he switched the tires around to get as many good tires on one trailer as possible. He then purchased new tires to replace the unusable ones. He further stated that he did not think any trailer had a spare. According to Messier, when the trailers were returned to Durastone in late August 1990, the tires were seventy percent better than when he received them. The evidence adduced by Messier is credible, Sarda's is not, and we find that Messier returned the trailers in at least the same condition as when received from Durastone, and that some trailers were in better condition when returned. Durastone questions the relevance and accuracy of the Warren Tire invoices introduced by Messier in support of its contention that it replaced tires on the trailers after they were picked up from the Durastone yard. Messier Ex. N. We agree that the invoices are not helpful and have accorded little weight to that exhibit. Evidence offered by Durastone in support of its tire claim are the photographs (Ex. 23), and the Paquin Estimate (Ex. 31). We also gave no weight to these Durastone exhibits because: (1) the photographs were taken in October 1991, almost one and one-half years after Messier returned the trailers; and (2) B. Allen Paquin testified that he inspected the trailers in question in March 1995, four and one-half years after Messier returned them. Considering the testimony of Donald Kinniburgh that these trailers were used by other hauling contractors after their return by Messier, it is irresponsible (possibly sanctionable) to allege that the damage shown in these photographs was caused by Messier. To further confuse things, there were more than ten trailers parked in the Durastone yard. The Paquin Estimate (Durastone # 31) mentions seventeen trailers, and Mr. Paquin stated that only three of those trailers had Messier decals on them. It would be beyond reasonableness to find, with any certainty, that any of the trailers in Exhibits 23 or 31 were used by Messier under the oral agreement.

Finally, quite apart from the factual determinations that have been made in Messier's

favor, Durastone did not have title to the trailers in question, and there is no evidence that U.S. Concrete had assigned the claim to Durastone. Therefore Durastone is without standing to pursue this claim. For all of these reasons, Durastone's entire claim for replacement tires is DENIED.

### (3) *Liability Insurance:*

Durastone asserts that Messier failed to provide liability insurance on the ten leased trailers, and seeks an offset in the amount of $14,000. Mr. Sarda testified that Durastone purchased insurance, and in support offered Exhibits 26 and 28. Exhibit 26 consists of copies of forty-six checks dated from March 17, 1987,[7] to October 18, 1991. They are drawn either on a U.S. Concrete Systems Account or a U.S. Filigree account, and one check has no information as to the payor. The payees of the checks include two insurance companies and one bank—Insurance Premium Acceptance Corporation, AANCO Underwriters, and Sun Bank of Volusia County, and none of them support Sarda's position. These exhibits are useless and all they demonstrate is the consistent unreliability of Durastone's evidence.

The other exhibit offered was an April 18, 1990 letter from Sarda to AANCO Underwriters, Inc. requesting a revised quotation for trailer insurance and the cost of a payment and performance bond to be issued in Messier's name. At the bottom of the letter were Sarda's handwritten notes purporting to memorialize a phone conversation with Leo Messier. The notes state that he (Sarda) informed Messier of the amount of the premium and that Sarda would try to obtain a bond for Messier. The notes also indicated that Leo Messier assented to Sarda obtaining the insurance and that Messier would reimburse Durastone for this expense. Leo Messier testified, and we believe him, that the alleged conversation with Sarda never happened and that he never agreed to pay Durastone for insurance on the trailers. This makes perfect sense, since the trailers were insured by Messier for the entire period of the lease. The uncontroverted testimony of Arthur Reilly, Messier's insurance agent, closes the door on this issue.

Even pretending *arguendo* that Durastone did purchase the insurance, it was paid for by a different entity—U.S. Concrete or U.S. Filigree. If insurance was in fact purchased by Sarda through one of his other companies, that was an error for which Messier may not be held responsible.

### (4) *Damages on the Tilcon Gammino Contracts:*

On October 1, 1990, when negotiations over the terms of a new labor contract failed, the workers at the Durastone facility went on strike. Durastone claims that Messier refused to cross picket lines during the strike and failed to deliver product to a highway construction site ordered by the general contractor, Tilcon Gammino. The product consisted of 11,140 square feet of gore markers valued by Durastone at a cost of $6 per square foot. Sarda testified that due to the delay, Tilcon Gammino was allowed to manufacture the product on site, removing the need for Durastone to supply its pre-fabricated gore markers. Sarda testified that he personally called and asked Messier to deliver the product in question, but that Messier refused.

Messier offered convincing evidence to counter this claim. The Durastone Plant Manager, Donald Kinniburgh, testified that during the strike he was performing all tasks that needed to be done, because as part of management he was not honoring the strike. He stated that there were no trailers loaded and ready for delivery during the strike, and that if Sarda wanted a trailer loaded during the strike, Kinniburgh said he would have done the loading. He stated that no one called Messier to do a delivery, and that he was never ordered to load any trailers. He also testified that Messier never refused to deliver product at any time during the year it performed hauling services for Durastone.

---

**7.** The oldest of these checks is dated two years and ten months *before* the oral lease with Messier. The relevance of these checks to the issue raised by Durastone is beyond our comprehension. In fact, they are so unconnected to anything in this case that their use could well be a Rule 9011 violation.

Messier's witnesses all denied receiving a request by Sarda to make a delivery during the strike.

Durastone has failed to produce *any* credible evidence to support its claim that there were losses on the Tilcon Gammino contracts, let alone that Messier was responsible for them. Kinniburgh is credible and we accept his testimony. Accordingly, this portion of Durastone's counterclaim is DENIED.

### (5) *Deficiency on the Note:*

To provide Messier with sufficient equipment to perform under the contract, Durastone agreed to purchase two boom trailers and then sell them to Messier, allowing payments over time. In furtherance of this agreement, the 1979 boom trailer was paid in full by one lump sum on May 17, 1990, via an offset initiated by Durastone.

The other boom was purchased new by Durastone on May 3, 1990, for $26,250, installed on one of Messier's trailers, and subsequently sold to Messier for the same price. Under the Promissory Note and Security Agreement, Meissier agreed to pay Durastone $500 per week, without interest, until the purchase price was paid in full.[8] *See* Durastone Ex. 19. While not in any written agreement, it was further understood and agreed that this sum would be paid bi-monthly from amounts owed by Durastone to Messier for hauling services. For reasons unexplained, Durastone never held back the $500 weekly note payments from Messier's check, and Meissier made only two payments totalling $2,500. In April 1991, Durastone repossessed the boom trailer and as of the trail date it was still parked in Durastone's yard, uncovered and exposed to the elements. Durastone never made demand for a deficiency prior to this trial.

Messier contends that Durastone retained the boom trailer in full satisfaction of its obligation under the promissory note, and that it owes no deficiency. Meissier also argues that Durastone failed to protect and maintain the collateral in a commercially reasonably manner.

Mr. Sarda initially testified that the boom trailer was not used after its repossession, and that he attempted to sell the trailer in a declining market, without success. He said he had a large for sale sign on his property that was visible from the highway. He also stated that in 1995 he did advertise the boom trailer for sale, and that on October 10, 1995, he received an offer of $4,000 from N & R Enterprises. Durastone filed a motion to sell the trailer, which was approved. Mr. Sarda stated that the trailer was still in the yard as of January 1998 because N & R was waiting until Spring to pick it up, even though it paid the full purchase price months earlier. On cross examination, when confronted with Messier Exhibit X, Sarda admitted that the boom trailer was used by Durastone after repossession. Exhibit X is a letter from Durastone to R & S Construction dated January 27, 1992, seeking rental payments for the boom trailer.

We have recently dealt with the issue of retention of collateral by a secured creditor in *Four Queens Enters., Inc. v. Forbes (In re Forbes)*, 191 B.R. 510 (Bankr.D.R.I.1996), *rev'd in part on other grounds*, 210 B.R. 905 (D.R.I.1997). In *Forbes,* where the secured creditor retained the collateral for over seventeen years, we stated that "[m]ost courts have found that a creditor who retains collateral for an unreasonably long time can be deemed to have retained the collateral in full satisfaction of its debt under § 9–505(2) [of the Uniform Commercial Code] even though the creditor failed to comply with the notice requirement of the statute. *See Lamp Fair, Inc. v. Perez–Ortiz,* 888 F.2d 173, 176–77 (1st Cir.1989); *Millican v. Turner,* 503 So.2d 289, 291 (Miss.1987)." *Forbes* 191 B.R. at 515. However, *Forbes* involved the application of New York law which follows the minority position "that an election by a secured party to retain collateral in satisfaction of the debt will not be implied, in the absence of written notice to the debtor pursuant to § 9–505(2)." *Id.* at 515.

In the instant case, Rhode Island law applies because the collateral has always remained in Rhode Island. *See* R.I.Gen.Laws

---

**8.** Upon default, the note called for interest to be    paid at the rate of 18% per annum.

§ 6A–9–103.[9] Rhode Island's retention of collateral statute states:

> (2) In any other case involving consumer goods or any other collateral, a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he or she has not signed after default a statement renouncing or modifying his or her rights under this subsection.... In other cases, notice shall be sent to any other secured party from whom the secured party has received (before sending his or her notice to the debtor or before the debtor's renunciation of his or her rights) written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within twenty-one (21) days after the notice was sent, the secured party must dispose of the collateral under § 6A–9–504. In the absence of such written objection, the secured party may retain the collateral in satisfaction of the debtor's obligation.

R.I.Gen.Laws § 6A–9–505(2). While there are no Rhode Island cases on point construing this statute, the First Circuit Court of Appeals in *Lamp Fair Inc. v. Perez–Ortiz*, 888 F.2d 173, 176–177 (1st Cir.1989), dealt with the Connecticut Uniform Commercial Code, Section 9–505(2) which is a verbatim version of the Rhode Island Statute.

In *Lamp Fair*, after retaining its collateral (a lighting store and inventory) for over one year, the secured creditor attempted to collect a deficiency that was the difference between the value of the collateral when it was returned and the balance due under the promissory note. The First Circuit stated that the majority of courts would rule that due to *Lamp Fair's* retention of the collateral, its deficiency claim would be barred under Section 9–505(2), regardless of whether it consciously chose to invoke this option. *See id.* at 176. The Court found, *inter alia*, that Section 9–505(2) governed and that the creditor's deficiency claim was barred.[10]

Similarly here, we conclude that Section 6A–9–505(2) is applicable and that Durastone's deficiency claim is barred, even though the "written notice" requirements of that section have not been fulfilled. *Lamp Fair*, 888 F.2d at 176. The Debtor's conduct clearly signaled its intent to retain the boom trailer in full satisfaction of the debt. After repossession, Durastone used the trailer, rented it, attempted to sell it, and has failed to offer any reasonable explanation as to why it still possesses the trailer some six and one-half years after the repossession. Accordingly, the deficiency counterclaim is DENIED.

## CONCLUSION

Based upon all of the evidence, we find that Messier has an unsecured claim in the amount of $62,521. The parties have agreed to an offset totaling $10,725, giving Messier an allowed unsecured claim of $51,796. Durastone's counterclaim is disallowed in its entirety.

Finally, Messier argues that it is entitled to pre-petition interest at the "legal rate" of 12% per year, and post-petition interest at the rate of 4.37% per year. We disagree. The confirmed plan provides that unsecured creditors "shall receive interest on the allowed principal amount of the claim from the date of the filing of the petition in this Case, to the date of the payment.... [P]ost petition interest will be paid at the rate of 4.37 percent." Messier Ex. M, Plan, p. 10. Accordingly, Messier is entitled to interest at the rate of 4.37% per year from March 15, 1993 until its claim is paid.

---

**9.** This section states:

Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected. R.I.GenLaws § 6A–9–103(b).

**10.** The Court acknowledged that Second Circuit law, which was controlling, had adopted the minority position with respect to Section 9–505(2), requiring that the written notice be given before imposing an election under that statute. However the Court noted that was in a "rather different context." *Lamp Fair*, 888 F.2d at 177.

Enter Judgment consistent with this opinion.